The STATE of Ohio, Appellee,

v.

NEELEY, Appellant.

[Cite as *State v. Neeley* (2001), 143 Ohio App.3d 606.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000023.

Decided May 25, 2001.

608

610

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Philip R. Cummings,* Assistant Prosecuting Attorney, for appellee.

*H. Fred Hoefle,* for appellant.

---

SUNDERMANN, Judge.

Following a jury trial in November 1999, appellant David L. Neeley was found guilty of the aggravated murder of Judy Smith, in violation of R.C. 2903.01(A), and sentenced to life imprisonment, to be served consecutively with another sentence unrelated to this appeal. In this appeal, Neeley raises thirteen assignments of error, none of which we find to be well taken.

### Factual Background

On May 28, 1994, the victim, Judy Smith, was reported missing in Clermont County, by her sister, Julie Watkins, after Smith had failed to pick up her daughter from school. Around midnight, Smith's car, a white Chevrolet Lumina, was recovered from Millcrest Park. Millcrest Park is a Hamilton County park located in Norwood, Ohio. A body of a woman believed to be Judy Smith was discovered on June 1 at Millcrest Park. The body, which had been buried under some leaves in a wooded area of the lower portion of the park, was partially decomposed and filled with maggots. Its back was against the ground, with the head above the feet, and the legs spread apart.

Detective Alderucci, who aided in the recovery of the body at Millcrest Park, testified that, although no one had moved the body from the location where it was found, the body had been moved to that location. It appeared to Alderucci that, based on the position of the body when it was found, lividity was not properly distributed. Further, Alderucci noted that there was no evidence of a fight or struggle and that very little blood was discovered. Finally, Alderucci noticed that the body was covered with mud, which was not otherwise present at the site.

A search of the park was subsequently conducted, but it did not reveal where the victim had been killed. During the search, however, a temporary order issued against appellant Neeley for Smith's protection, and Smith's purse was recovered from the middle portion of the park. A fingerprint lifted from the purse did not belong to Smith or to Neeley.

Dr. Gerber performed an autopsy. He testified that the body was that of a woman weighing about one hundred thirty pounds and measuring five feet six inches in height. The woman had blonde hair and had been wearing a white jumpsuit. Dr. Gerber testified that the woman, whom he identified as Judy Smith, had been stabbed to death and had suffered over forty stab wounds to her body. She also had defensive wounds on her upper and lower extremities. Dr. Gerber did not identify any semen on Smith.

While the coroner could not establish which stab wound had ultimately caused Smith's death, he identified several fatal injuries to the heart and lung. In Dr. Gerber's opinion, the heart and lung injuries would have caused "spurting blood coming from some of these wounds at the time of the act, so that it would be impossible to conceive that somebody would not have some blood on them * * *." Although Dr. Gerber was unable to establish the exact date and time that Smith had been murdered, he estimated, based on the body's decomposition, that she had died on May 28 sometime in the afternoon. Given the extent of the injuries, Dr. Gerber opined that a strong person had attacked Smith and that it was likely that she had died within an hour of being attacked. Finally, Dr. Gerber testified, based on the lividity and the lack of blood where the body was found, that Smith had originally been lying face down with her buttocks above her face, and that her body had probably been moved after her death.

Lieutenant Steven Crowe and Detective John Patrick were the lead investigators assigned to Smith's murder. According to Detective Patrick, Neeley quickly became a suspect because Neeley was Smith's former boyfriend and because Neeley had a prior conviction in Kentucky for first-degree assault and had been sentenced to serve ten years in prison, which had been suspended due to an appeal bond.

Smith and Neeley had dated for about seven years and had previously lived together with Smith's daughter from a previous marriage. Their home was

located on Ivanhoe Avenue in Norwood, which is about six-tenths of a mile from Millcrest Park. Smith had moved out in April 1994 after she had broken up with Neeley. At the time of her disappearance, Smith had been living with Julie Watkins and her husband, Steven, at their trailer home in Greenbrier Estates, which is located in Clermont County.

Neeley's home was searched on June 2. During the first search, a pair of jeans and two knives were recovered. Testing of the knives established that they did not contain any trace of human blood. A second search of Neeley's house was conducted on July 22, and some torn-up photographs of Smith and her family were found in the wastebasket. On June 2 and 3, a trained police dog conducted a search of Millcrest Park. Using the jeans found at Neeley's home, the dog was able to track a scent from the jeans to a site near the wooded area of the park. The dog was also able to track the scent found on the underwear found in Smith's car to a site near the wooded area. But the dog was unable to track the scent of Smith's purse.

The officers spoke with Neeley several times about his relationship with Smith. On June 1, Neeley told Lieutenant Crowe that he had last spoken with Smith on May 27, when he had informed Smith that he could not meet her on May 28 "because he was leaving earlier than expected for Kentucky." On June 4, both Detective Patrick and Lieutenant Crowe spoke with Neeley at his parent's home in Kentucky. During that conversation, Neeley informed the officers that he had stopped at a United Dairy Farmer's store ("UDF") in Norwood on the morning of May 28 before going with his sister to stay at his family's home in Kentucky. Neeley also informed the officers that he had last spoken with Smith by phone at 5:00 a.m. on May 28. On July 9, Detective Patrick spoke with Neeley about his alibi. Detective Patrick told Neeley that he could not have been at the UDF on May 28 because Patrick had reviewed the store's surveillance tapes and had found that Neeley was not portrayed in them. Confronted with the reasons supporting Detective Patrick's belief, Neeley denied being at the UDF on May 28. The police spoke with Neeley for the final time on July 18, and Neeley indicated that the last time he had seen Smith was on May 26.

In the months preceding Smith's disappearance, she had had several unfortunate encounters with Neeley. On May 1, Officer Matthew Wurtz had arrested Neeley for the reckless operation of his pickup truck at Greenbrier Estates and for the aggravated menacing of Smith. In speaking with Officer Wurtz, Smith had indicated that she was afraid that Neeley would "kill her."

On May 2, Neeley had attempted to drive Smith off the road after meeting her at a UDF in Newtown, Ohio. A UDF employee had called the police. Neeley was charged with domestic violence and was arrested on May 3. A temporary protection order was issued against him for Smith's protection. At a preliminary

hearing relating to this event, Neeley told Smith that he was not worried about the domestic-violence charges because "she wouldn't be there to testify." The record establishes that, had Neeley been convicted for the three misdemeanors in Clermont County, his appellate bond in Kentucky would have been revoked and he would have been required to start serving his ten-year suspended sentence.

On or about May 20, Smith confided to a coworker, Christopher Lipscomb, that she was afraid of Neeley. On May 26, 1994, Patricia Rankin overheard a conversation between Smith and Neeley during which Neeley had yelled, "If you [Smith] go [to court on Monday] I'm going to kill you, bitch * * *."

Jerry Burchette, a neighbor, testified that he had a conversation with Neeley about Smith sometime in May 1994 and that Neeley had indicated that Smith deserved to die. In a sworn statement given to the police, Burchette had used stronger language to describe his conversation with Neeley, indicating that Neeley had stated that he would kill Smith or "have it done."

On May 27, the day before Smith disappeared, Neeley apparently attempted to contact Smith at her mother's home, her sister's home, and a local bowling alley. Julie Watkins spoke to Neeley during one of those attempts. According to Watkins, Neeley had called Smith to arrange a meeting so that they could "sign some papers."

During the evening on May 27, Smith was with her coworker, Larry Jones, at a local bowling alley. According to Jones, he had spoken with Neeley over the telephone. After Jones informed Neeley that Jones was Smith's "boyfriend," Neeley became enraged. Jones further testified that, after the phone call, Smith and Jones had left the bowling alley, had gotten some food, and had had sexual relations in the back of Smith's car. Smith had dropped Jones off at the bowling alley around 10 p.m. According to Julie and Steven Watkins, Smith had returned home around 1:30 a.m.

The evidence concerning Smith's whereabouts on May 28 was partly circumstantial. Julie and Steven Watkins both testified that, when they awoke at 10:20 a.m., Smith was gone, but there was a message from Smith's daughter that her mother had not picked her up from school as planned. In Julie Watkins's estimation, she believed that her sister had left her house around 7 a.m.

At 7:40 a.m., Neeley and Smith were seen together near Millcrest Park. Donna Gillespie Long was on her way to work when she drove past two individuals whom she later identified as Smith and Neeley. According to Long, a bigger-boned, blonde-haired woman wearing a white top had been standing near a blue Corsica that was stopped at the side of the road. The woman was yelling at a man whom she identified as "David" to get back into the car. Long testified that

the man had blonde hair, was clean-shaven, and was wearing a blue plaid shirt with blue jeans.

Between 9:00 and 11:00 a.m., various witnesses saw both Neeley and Smith at Neeley's residence. Patricia Manning, a neighbor, testified that she had seen Smith, who was wearing a white shirt, sitting in her car talking with Neeley's sister, Donna Hayes. Jerry Burchette testified that, at about 9:00 or 10:30 a.m., he had seen Neeley's truck and a Dodge Omni in Neeley's driveway, and that the door to the house was open. Lois Burchette, Neeley's neighbor, testified that, around 11:00 a.m., she had seen Neeley's pickup truck, Hayes's car (an Omni), and Smith's car in Neeley's driveway. Mary Hoskins, Smith's mother, testified that she had driven by Neeley's home around 10:30 or 11:00 a.m. and had not seen Smith's car, but that she noticed that the house appeared to be open. Julie Watkins drove by Neeley's home around 11:30 a.m. and noticed that the house was open.

Between 11:00 a.m. and 1:00 p.m., Neeley and Smith were both seen at Millcrest Park. Charlotte Riggs, who was at the park for a church picnic, testified that she had observed a blonde-haired woman wearing a white top and jeans, with no shoes, standing near the restrooms. According to Riggs, the woman looked like she had been wrestling with someone. Riggs also testified that, around 12:30 or 1:00 p.m., she had observed a man walking alone towards the ballpark. According to Riggs, the man was clean-shaven, had light brown hair and a tattoo, and was wearing a dark T-shirt. Riggs testified that, in her opinion, the man looked angry. Riggs also observed a white car in the parking lot. Riggs later identified the man and the woman she had seen at the park as Neeley and Smith.

Cindy Norman was also at the park with Riggs on the church picnic. Norman observed a woman with blonde hair, wearing a white outfit and no shoes, near the bathrooms in the park. Norman also saw a man leaving the park alone around 12:40 p.m. The man was wearing a plaid shirt, looked dirty, and had long, dark-brown hair that was "messy." Norman also observed a white car in the parking lot. When questioned by police three years later, Norman was able to identify Smith and Neeley as the two individuals she had observed at the park.

Around noon, Neeley's neighbor, Mike Hager, saw Neeley walking towards his house. According to Hager, Neeley was wearing jeans and a T-shirt and was carrying a light-colored shirt on his arm. Hager did not notice any blood or dirt on Neeley. Hager testified that, around the same time, he had also seen Hayes's car in Neeley's driveway. While Hager did not see Neeley after May 28, Hager testified that he had observed two people getting something from Neeley's truck on May 31.

Around 12:30 p.m., Julie Watkins and Mary Hoskins drove by Neeley's house and noticed that Neeley's door was closed.

Only Fredrick and Peggy McQueen testified on behalf of Neeley at trial. Essentially, they each testified about Neeley's good character and that, when they had seen him on May 29, 1994, he had had black hair and a full beard.

## ASSIGNMENTS OF ERROR

Neeley challenges the sufficiency of the evidence in his first assignment and the weight of the evidence in his second assignment. In his third assignment, he alleges that the trial court erred by denying his Crim.R. 29 motion for acquittal. We address these assignments together.

The relevant inquiry for reviewing the denial of a Crim.R. 29 motion is the same as the inquiry for sufficiency.[1] To reverse a conviction for insufficient evidence, we must be persuaded, after viewing all of the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[2] To reverse on the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and conclude that, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice.[3] A new trial should be granted only in exceptional cases where the evidence weighs heavily against conviction.[4]

In support of his sufficiency argument, Neeley argues that the evidence was insufficient to prove the following: (1) venue, (2) that the body found at Millcrest Park was that of Judy Smith, (3) that Neeley had committed aggravated murder, and (4) that Neeley had the motive or opportunity to murder Smith.

We are persuaded that sufficient evidence was presented to establish that the victim's body was actually that of Judy Smith. Throughout the trial, there seemed to be no question that the body recovered from Millcrest Park was Smith's. An opal ring, which apparently belonged to Smith, was found on the

---

1. See *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.

2. See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

3. See *State v. Thompkins* at 387, 678 N.E.2d at 546–547.

4. *Id.*

body's hand. Additionally, circumstantial evidence was presented to establish that the body was that of Smith. The body resembled Smith in height, weight, and clothing, and in the fact that it had no shoes (Smith was notorious for not wearing shoes). Further, Smith was reported missing on May 28, 1994, and, based on the testimony of Riggs and Norman, she was last seen alive at Millcrest Park on that day. While other probative evidence might have been introduced to establish that the body was that of Smith, we conclude, under these circumstances, that sufficient evidence was presented to persuade a jury that the body found at Millcrest Park was Smith's.

 Similarly, we conclude, based on the circumstantial evidence in the record, that venue was established. Although Dr. Gerber's and Detective Alderucci's testimony suggested that the victim's body had been moved, the prosecution presented evidence that Smith was last seen alive at Millcrest Park, which is located in Hamilton County. The prosecution also presented evidence that Smith's car was found at Millcrest Park. Furthermore, Smith's body and purse were later found in the park.

 Finally, although there was no direct physical evidence linking Neeley to Smith's murder, we cannot say that the circumstantial evidence presented by the prosecution was insufficient to prove that he had committed aggravated murder. The elements of aggravated murder under R.C. 2903.01(A) require proof that Neeley had "purposely, and with prior calculation and design, cause[d] the death of [Smith] * * *."

The prosecution presented evidence demonstrating that Smith and Neeley were seen together early in the morning on May 28, 1994 and that Smith had been seen at Neeley's home later that morning. Further, there was testimony that, around noon, Smith was last seen at Millcrest Park looking disheveled. Neeley was also at the park around that time, but he was seen leaving the park a little while later. The prosecution also presented evidence that Smith was reported missing on May 28, 1994 and that her body was found at Millcrest Park several days later. According to the coroner, Smith had died from multiple stab wounds, and, based on the body's lividity, she had been dead for several days.

Evidence was also presented to show that Neeley had been charged with aggravated menacing and domestic violence against Smith and that a temporary protection order had been issued against Neeley for Smith's protection. Further, there was evidence that Neeley had threatened to kill Smith on several different occasions. While the evidence was largely circumstantial, we remain convinced that it was sufficient to persuade a trier of fact that the elements of aggravated murder were proved.

■ Moreover, we are unconvinced that the jury improperly weighed the evidence. The jury apparently found the testimony of the state's witnesses, including the testimony of Jerry Burchette, Julie and Steve Watkins, Donna Gillespie Long, Charlotte Riggs, Cindy Norman, Neeley's neighbors, Smith's coworkers and mother, the coroner, and the police officers, to be more credible than the testimony of Fredrick and Peggy McQueen. Because the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact,[5] we cannot say that, as a matter of law, the jury improperly weighed the evidence. In this case, the evidence presented at trial amply supported Neeley's conviction. Accordingly, we overrule, Neeley's first, second, and third assignments of error.

Next, we address Neeley's fourth assignment, which claims that Neeley was denied his right to a fair trial due to four instances of prosecutorial misconduct and various discovery violations. We address the prosecutorial misconduct first.

■ To reverse a conviction based on prosecutorial misconduct, the alleged misconduct must have deprived the defendant of a fair trial.[6] In determining that the conduct complained of denied Neeley this right, we must conclude that the prosecutor's remarks were improper and that they prejudicially affected Neeley's rights.[7] The touchstone of this analysis is whether the trial was fair, not the prosecutor's culpability.[8] The effect of the prosecutor's alleged misconduct must be considered in light of the whole trial.[9] During summation, a prosecutor has "wide latitude" in stating what the evidence shows and the reasonable inferences that may be drawn from it; that latitude does not, however, "encompass inviting the jury to reach its decision on matters outside the evidence adduced at trial."[10] While the prosecution may strike hard blows, it may not strike foul ones.[11]

---

5. See *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

6. See *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136, 143; *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 402–403, 473 N.E.2d 768, 793.

7. *State v. Smith* (2000), 87 Ohio St.3d 424, 442, 721 N.E.2d 93, 112; *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, 300.

8. See *State v. Smith, supra,* quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87–88.

9. See *State v. Maurer* at 266, 15 OBR at 402–403, 473 N.E.2d at 792–793.

10. *State v. Hart* (1994), 94 Ohio App.3d 665, 672, 641 N.E.2d 755, 759.

11. *Id.*

Neeley complains of four instances of misconduct during closing arguments. First, Neeley claims that the assistant prosecutor argued facts outside the record. He points specifically to references concerning whether Neeley and Smith had arranged to meet at Millcrest Park on May 28, 1994. During closing argument, the assistant prosecutor identified for the jury several "wild coincidences" in the case. In particular, the prosecutor stated,

"Number 3, the fact that *Judy [Smith] was killed and found at Millcrest Park, which just so happens to be Neeley and Judy's meeting place,* they want you to believe that that's just a coincidence. Out of all places in Hamilton County, just happens that she is found there.

"Number 4, the fact that Judy was killed only four days before she was scheduled to be in court in a case against Mr. Neeley; again, that's just a coincidence. That's what they want you to believe.

"The fact that *Neeley, by his own statements to police, he told police that he had planned to meet Judy in Millcrest Park. The fact that he planned to meet her there that very day—*" (Emphasis added.)

An objection was raised, and the court stated the following:

"Ladies and gentlemen of the jury, you must decide what the evidence is. Obviously counsel has divergent views of what the evidence is, it doesn't make any difference.

"As he told you, final argument is not evidence, it's only their opinions. You are the ones that decide what the facts are in this case, that's your province."

After reviewing the record, we note that, just prior to the comments identified by Neeley as improper, the assistant prosecutor had made two similar comments. First, the assistant prosecutor stated, "Neeley continues to call and told police he even called that morning around five in the morning on May 28 to try to get a hold of Judy, because *he wanted to make sure that Judy would meet him at Millcrest Park.*" (Emphasis added.) Then, the prosecutor stated, "[Neeley's] prior calculation and design is proven by the fact that he *calls [Smith] repeatedly to set up a meeting with her in Millcrest Park.*" (Emphasis added.)

The record is clear that Neeley had told Lieutenant Crowe that he was *not* planning on meeting Smith on May 28, because he was going to leave for Kentucky earlier than previously planned. Furthermore, while some evidence may indicate that Neeley and Smith had planned to meet on May 28, the evidence does not establish that Smith and Neeley had planned to meet at Millcrest Park. As there is no evidence suggesting that Neeley and Smith had planned to meet at Millcrest Park on May 28, the assistant prosecutor's comment was clearly improper.

■ Second, Neeley claims that the assistant prosecutor's statement that Smith was killed at Millcrest Park was based on facts outside the record. No objection to this was raised by Neeley's counsel at trial. As a result, Neeley is precluded from predicating error on this alleged instance of misconduct, except to the extent that it may reflect prejudice stemming from the prosecutors' conduct during the whole trial.[12]

■ Third, Neeley argues that, during rebuttal closing argument, another assistant prosecutor improperly commented on Neeley's failure to testify by stating, "[Neeley] is the only person that's refused to account for his whereabouts." Defense counsel objected to this and moved for mistrial. The court then issued the following instruction: "Ladies and gentlemen, the defendant does not have to take the stand, nor does the defense have to prove anything. Go ahead." The assistant prosecutor followed by stating, "Ladies and gentleman, what I was referring to is in his statements to the police he was the only person that refused to account for his whereabouts."

A prosecutor's comment on a defendant's failure to testify is improper.[13] To determine whether Neeley's rights were violated in this case, we must examine "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."[14]

■ The state argues that the assistant prosecutor's comment was directed at the strength of the state's case. The comment, however, suggested an impermissible inference about Neeley's failure to take the witness stand. Moreover, the assistant prosecutor's attempt to clarify his comment after the court had issued a curative instruction invited the jury to consider Neeley's failure to testify at trial. Accordingly, we hold that this comment was improper.

■ Finally, Neeley contends that the second assistant prosecutor mischaracterized the evidence. Not long after commenting on Neeley's failure to take the witness stand, the assistant prosecutor stated:

"[PROSECUTOR]: [Y]ou are going to have the statement of Jerry Burchette in the jury room and he said that the defendant told him he was going to kill that bitch or have it done. And that he was going to load the body—

"[DEFENSE COUNSEL]: Objection, Judge, it's not a fair comment.

---

12. See *State v. Hart* at 674, 641 N.E.2d at 761.

13. See *State v. Fears* at 336, 715 N.E.2d at 145.

14. *Id.* at 336, 715 N.E.2d at 146, quotations omitted.

"THE COURT: Overruled.

"[PROSECUTOR]:—into her car with the keys that he kept, drive her back to Kentucky, and Judy Smith nor her car would ever be found again.

"Because at that point she's still just a missing person and there's no body. She wouldn't be found in the hills of Kentucky, out in the country where he's from."

While there was some discrepancy between Burchette's sworn statement and his in-court testimony, essentially Burchette's testimony related that Neeley had planned on harming Smith. Despite the discrepancy, Burchette never testified or alluded to how Neeley had planned to kill Smith or how he would dispose of her body.

The assistant prosecutor's statement, therefore, was clearly a misstatement of Burchette's in-court testimony and his signed affidavit. Moreover, no testimony was presented during the course of the trial, and the circumstantial evidence did not support the conclusion that Neeley had planned on moving Smith's body to Kentucky after her death. As no evidence was admitted relating to this comment, the comment was improper.

 Having determined that three of the challenged comments were improper, we must next view the remarks in light of the entire closing argument to determine whether they were prejudicial. To recognize prejudicial error, we must conclude that the cumulative effect of the misconduct prejudicially affected Neeley's substantial rights and that the evidence adduced at trial was not so compelling that the jury would have inevitably found him guilty beyond a reasonable doubt.[15]

The trial court issued curative instructions for the comment regarding the alleged meeting at Millcrest Park and for the comment relating to Neeley's refusal to testify. These instructions occurred immediately after the improper comments. The court, however, did not sustain an objection to, or issue an admonition for, the comment relating to Burchette's testimony. In our view, this comment was the most deserving of a curative instruction by the court because there was no evidence relating to the place of death or to how Smith's body was moved from that place to the location in Millcrest Park where it was found.

 Although we are deeply concerned by the improper remarks, we cannot say that the cumulative effect of the misconduct denied Neeley a fair trial. First, as we have already held, the evidence of guilt presented in this case, although circumstantial, was sufficient to sustain the jury's verdict, and the verdict was not

---

15. See *State v. Freeman,* (2000), 138 Ohio App.3d 408, 419–420, 741 N.E.2d, 566, 573.

against the manifest weight of the evidence. Second, the court issued timely and appropriate curative instructions for two of the comments. Under these circumstances, we conclude that the comments were not prejudicial, but we caution prosecutors to refrain from making such misstatements of the evidence and the law in the future.

We now turn to the alleged instances of discovery violations. Neeley first claims that he was denied his right to a fair trial because the prosecution had failed to disclose exculpatory evidence. Specifically, Neeley alleges that he was not informed during discovery that Riggs had told the police that the man she saw at the park had a tattoo. But, based on the fact that the trial court permitted Neeley to demonstrate that he did not have a tattoo, and because there was also a stipulation that Neeley did not have a tattoo on his arm, we are unpersuaded that he was prejudiced by the prosecution's failure to disclose this evidence.

The final instance of alleged prosecutorial misconduct relates to "surprise" testimony given by Detective Patrick about Neeley's statements to the police and about a UDF videotape.

Neeley first argues that Patrick testified about events that were not included in his investigation notes, which were prepared after the meetings in June and July 1994. Having reviewed the record, we are unconvinced that Neeley was "surprised" by Patrick's testimony. The state disclosed, in a supplemental statement, that Neeley had refused to discuss with the police his whereabouts on May 28. Further, the state provided Neeley's trial counsel with summaries of the police officers' conversations with Neeley. And, to the extent that Patrick's testimony differed from his notes, Neeley's trial counsel effectively cross-examined Patrick about any discrepancies between the notes and his in-court testimony. As a result, we conclude that Neeley was not prejudiced by the prosecutor's failure to disclose the oral statements.

Moreover, Neeley argues that the prosecutor erred by failing to disclose a copy of the videotape from UDF. Again, we conclude that Neeley suffered no prejudice from his inability to view the videotape before trial because the trial court eventually allowed the defense to review the videotape and to call a witness back to cure any misstatements. Accordingly, we overrule Neeley's fourth assignment of error.

In Neeley's fifth assignment, he alleges that the trial court erred in permitting a grossly prejudicial videotape of the body as it was found at Millcrest Park to be viewed by the jury, thereby denying him his rights to due process of law and to a fair trial. In his sixth assignment, Neeley alleges that the trial court erred in

admitting prejudicial photographs. Because Neeley argues these two assignments together, we address them in the same fashion.

It is well established that the admission of relevant photographs is left to the sound discretion of the trial court.[16] An abuse of discretion connotes more than an error of law or an error in judgment; it implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court.[17]

Pursuant to Evid.R. 403, a trial court must reject an otherwise admissible photograph where its probative value is substantially outweighed by the danger of unfair prejudice,[18] and the trial court may reject an otherwise admissible photograph where its probative value is substantially outweighed by its cumulative nature or by considerations of undue delay.[19] But, in capital cases, a stricter standard is imposed: properly authenticated, nonrepetitive photographs, even if gruesome, are admissible as long as they are relevant, the probative value of each photograph outweighs the danger of material prejudice to the accused, and the photographs are not repetitive or cumulative in number.[20] Under Evid.R. 403, evidence must be excluded where the probative value is minimal and the prejudice is great, but in a capital case, the probative value must outweigh the danger of prejudice. Because this is not a capital case, before admitting the photographs, the trial court had to determine whether the danger of prejudicial impact substantially outweighed the probative value of the photographs and whether the photographs were repetitive or cumulative in nature.

Neeley argues that the trial court erred in admitting the photographs of the victim, particularly the maggot-ridden remains of the face of the victim. According to Neeley, these photographs were repetitive, gruesome, and inflammatory. While the photographs (seven of which were taken at Millcrest Park and seven of which were taken at the morgue) were admittedly gruesome, they were not *per se* inadmissible.[21] The photographs depicted the location where Smith was found, the placement of Smith's body at that location, the location of the wounds causing her death, and the defensive wounds on her hands. The

---

16. See Evid.R. 403 and 611(A); *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273.

17. See *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144, 149.

18. See Evid.R. 403(A).

19. Evid.R. 403(B).

20. See *State v. Morales* at 258, 513 N.E.2d at 273–274; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus.

21. See *State v. Maurer* at 265, 15 OBR at 401–402, 473 N.E.2d at 792.

photographs were helpful in illustrating the testimony of the police officers, the coroner, and the witness who found Smith's body at the park. Moreover, the photographs were probative of the fact that Smith had been moved from the location where she was murdered and of Neeley's purpose to cause death. In sum, the probative value of the photographs substantially outweighed the danger of prejudice to Neeley, and they were not repetitive or cumulative in nature. Accordingly, we find no abuse of discretion in the trial court's decision to admit the photographs into evidence.

▆▆▆ Similarly, we are unpersuaded that Neeley was prejudiced when the jury was allowed to view a videotape that was not admitted into evidence because the videotape, like the photographs, depicted where and how Smith's body was found at Millcrest Park and the extent of her injuries. Given that, the fifth and sixth assignments of error are overruled.

In his seventh assignment, Neeley maintains that the trial court erred in admitting prejudicial opinion testimony, thereby denying him his rights to due process of law and to a fair trial. Neeley challenges Detective Patrick's opinion testimony that Neeley was guilty. Patrick testified as follows:

"Q. Okay. Now, during your investigation did you also interview Judy Smith's first husband?

"A. Yes.

"Q. That's the father of Mandy Smith?

"A. Danny Smith.

"Q. Did you talk to him?

"A. Yes.

"Q. Was he cleared as a suspect?

"A. Yes.

"[DEFENSE COUNSEL:] Objection as to conclusion.

"THE COURT: Sustained. Strike.

"Q. In your investigation were you able to uncover anybody other than that man right there, that was an enemy to Judy Smith.

"[DEFENSE COUNSEL:] Objection. Move for mistrial. Ask that it be stricken.

"THE COURT: Strike.

"Q. Did you find out any enemies of Judy Smith at all? Anybody that—

"THE COURT: In his opinion.

"Q.—in your opinion would be considered an enemy of Judy Smith.

"A. No, sir.

"[DEFENSE COUNSEL:] Objection. It's not evidence. There's no probative value.

"THE COURT: Overruled."

■ Neeley argues that the trial court abused its discretion in admitting Patrick's testimony. In response, the state maintains that any error was cured by the court's decision sustaining two of the three objections and striking the responses. Moreover, the state suggests that the admitted response appropriately constituted opinion testimony of a lay witness.

■ We agree that the trial court cured any error by sustaining the two objections and striking Patrick's testimony. And, as for Patrick's final comment that, in his opinion, Smith did not have any enemies, we must turn to Evid.R. 701, which governs opinion testimony by lay witnesses:

"If a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or determination of a fact in issue."

Thus, in order for Patrick's lay-opinion testimony to have been admissible, it must have been rationally based upon his perceptions and helpful to an understanding of his testimony or a determination of fact in issue.

We conclude that both requirements of Evid.R. 701 were met. Detective Patrick's testimony was based wholly on his perceptions of and investigation into Smith's murder, and it was helpful to an understanding of Neeley's motive and intent. Accordingly, the seventh assignment of error is overruled.

In the tenth assignment, Neeley argues that the trial court erred in overruling his motion to suppress evidence seized from his home, including a pair of jeans and cut-up photographs of Smith. Here, Neeley does not attack the validity of the search warrant, but rather he attacks the scope of the search. Basically, Neeley argues that the blue jeans and the photographs, which were not named in the warrant but were seized in its execution, should have been suppressed. In response, the state argues that the jeans were obtained within the scope of the warrant and that the cut-up photographs were properly seized under the plain-view doctrine.

■ We are unpersuaded that the jeans were obtained outside the scope of the search warrant. Several witnesses had observed Neeley wearing blue jeans on May 28. Clearly, the officers could have believed that the jeans contained

trace evidence of the crime, as provided in the search warrant. Accordingly, the trial court did not err in overruling the motion to suppress as it related to the blue jeans.

Moreover, we are unpersuaded that the cut-up photographs were improperly seized. The plain-view doctrine provides that a police officer may seize an item where the initial intrusion leading to the item's discovery is lawful and it is immediately apparent to the officer that the item is incriminating.[22] Here, the police officers were lawfully looking inside a wastebasket, which, according to the trial court, contained trace evidence, when they observed cut-up photographs of Smith. Because the incriminating nature of the cut-up photographs was immediately apparent to the police officers given the fact that they depicted the victim, the trial court did not err in overruling the motion to suppress the photographs. Therefore, we overrule the tenth assignment of error.

The eighth, ninth, and part of the eleventh assignments of error concern evidence of Neeley's prior criminal acts. Neeley filed two motions *in limine* prior to trial seeking to exclude evidence relating to his Kentucky conviction and the pending criminal charges in Clermont County because such evidence was inadmissible under Evid.R. 404(B). In response, the state argued that the evidence was admissible because it was probative of motive, intent, and identity.

At a pretrial hearing on the motions, the trial court refused to make a ruling because it determined that, depending on how the evidence was presented at trial, it might properly show identity, motive, or intent. Therefore, the trial court indicated that it would rule on the admissibility of the evidence when it was proffered at trial. Although Neeley repeatedly objected at trial to the evidence of his prior acts, the evidence was admitted.

Generally, evidence of a defendant's "bad character" or propensity to engage in misconduct is prohibited by Evid.R. 404(A) where it is offered by the state to prove that the defendant committed the crime alleged. Evid.R. 404(B), however, operates as an exception to the rule under the following circumstances:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

---

22. See *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564, 583; *State v. Waddy* (1992), 63 Ohio St.3d 424, 442, 588 N.E.2d 819, 833, superseded by state constitutional amendment on other grounds in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

Thus, evidence of prior misconduct may be admissible where it is probative of such things as motive, intent, or identity.

Here, the identity of the perpetrator of the crime and the perpetrator's motive and intent were in issue. The state offered the evidence relating to Neeley's pending charges in Clermont County for reckless driving, aggravated menacing, and domestic violence in order to establish that Neeley had planned to murder Smith in order to prevent her from testifying at his hearing on June 1, 1994. Further, the state offered the evidence of Neeley's prior assault conviction in Kentucky to demonstrate motive because Neeley faced serving his suspended sentence in Kentucky if he was convicted of any of the Clermont County charges.

Having reviewed the record, we conclude that the challenged evidence properly related to motive, intent, identity, and preparation. Under the circumstances, that evidence was not unduly prejudicial, particularly where the court issued limiting instructions both during the trial and in its final charge to the jury. Specifically, the court instructed the jury to consider the evidence relating to prior "bad acts" only for the purpose of deciding whether it proved the absence of mistake, motive, opportunity, intent, or purpose. The eighth and ninth assignments of error are, therefore, overruled. And the eleventh assignment, insofar as it challenges the admission of evidence concerning the facts underlying the Kentucky conviction and the pending charges in Clermont County, is also overruled.

In the remaining part of the eleventh assignment, Neeley maintains that the trial court erred in admitting hearsay evidence as well as evidence of a "scent training dog, a pair of jeans, and opinion testimony from Officer DeCamp."

First, Neeley maintains that the trial court erred in admitting hearsay testimony by Dr. Gerber, the coroner, relating to the identity of the victim. Nothing in the deposition testimony, however, suggested that Dr. Gerber had formed his opinion based on hearsay evidence. Moreover, we have already held that other evidence was presented to identify the body as that of Judy Smith. Accordingly, we conclude that the trial court did not abuse its discretion in admitting Dr. Gerber's testimony.

Second, Neeley maintains that the trial court erred in admitting dog-trailing evidence in the absence of a proper foundation. In Ohio, the admission of evidence concerning the use of a tracking dog is permitted provided that a proper foundation has been established.[23] To establish that foundation, the training and

---

23. See *State v. Dickerson* (1907), 77 Ohio St. 34, 82 N.E. 969, syllabus; *State v. Bridge* (1989), 60 Ohio App.3d 76, 573 N.E.2d 762.

reliability of the dog, the qualifications of the person handling the dog, and the circumstances surrounding the trailing by the dog may be shown.[24]

Officer DeCamp testified that the dog and the handler had been professionally trained, and DeCamp explained how the trailing was performed. Any evidence as to the dog's failure rate went to the weight, not the admissibility, of the evidence. Moreover, the record indicates that the jury was given the following instruction:

"Dog trailing evidence must be viewed with utmost caution. It is of slight probative value. It must be considered in conjunction with all the testimony in the case and does not warrant a conviction absent some other direct or circumstantial evidence of guilt."

Because the proper foundation was laid and the court instructed the jury concerning the limited probative value of the evidence, we conclude that the trial court did not abuse its discretion in admitting DeCamp's testimony.

Finally, Neeley maintains that the trial court erred in admitting, over objections, a pair of jeans used in the dog-tracking search and testimony from DeCamp concerning the jeans. Essentially, Neeley maintains that the evidence was not relevant because there was nothing to show that Neeley had worn the jeans.

The admission or exclusion of relevant evidence lies within the sound discretion of the trial court.[25] Here, the evidence established that Neeley was seen wearing a plaid shirt and a pair of jeans on May 28, 1994. After May 28, Neeley had not been at home. On June 2, two pairs of jeans were recovered from Neeley's home, and one pair was admitted into evidence. DeCamp testified that the police dog had traced Neeley's scent from the jeans recovered from his home. Because ownership of the jeans went to weight, not admissibility, we conclude that the trial court's decision to admit the jeans and the accompanying testimony was not so arbitrary, unreasonable, or unconscionable as to connote an abuse of discretion[26] and that Neeley was not prejudiced by their admission.[27] We overrule the remaining portion of the eleventh assignment of error.

Neeley argues in the twelfth assignment that the trial court erred in overruling his motions to dismiss the indictment. Basically, Neeley contends that, because

24. See *State v. Dickerson; State v. Bridge* at 78, 573 N.E.2d at 765.

25. See *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

26. See *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144.

27. See Evid.R. 403.

the investigation into Smith's murder was essentially complete in June 1994, he was denied his constitutional rights to due process and a speedy trial when the indictment was filed over three years later and when it took another two years to bring him to trial.

The constitutional right to a speedy trial under the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution does not apply to preindictment delays.[28] Rather, a defendant's constitutional right to a speedy trial is implicated only when the defendant has become the subject of an official accusation.[29] But, under certain circumstances, a delay between the commission of an offense and the return of an indictment may constitute a due-process violation when it results in actual prejudice to the defendant.[30] Proof of actual prejudice does not automatically give rise to a due-process violation; rather, the court must view the prejudice suffered by the defendant in light of the state's reason for the delay.[31] For a preindictment delay to constitute a violation of due process, the defendant has the burden to establish the necessary elements.[32]

Here, Neeley was not indicted for any offense arising from Smith's murder until 1997. He was, therefore, not protected by the speedy-trial guarantees for this pre-indictment delay.

Further, based on the record of the proceedings below, Neeley has not demonstrated a due-process violation because of the delay between Smith's murder and his indictment. Neeley contends that his incarceration hampered his ability to prepare a defense. Specifically, he alleges that material evidence was lost, that his ability to locate witnesses was impaired, and that witnesses' memories faded.

Because Neeley points to no particularized loss of evidence or witnesses as a result of the delay, and because there is nothing in the record demonstrating such

---

28. See *United States v. Marion* (1971), 404 U.S. 307, 313–315, 92 S.Ct. 455, 459–460, 30 L.Ed.2d 468, 474–475; *State v. Luck* (1984), 15 Ohio St.3d 150, 153, 15 OBR 296, 298–299, 472 N.E.2d 1097, 1101.

29. See *United States v. Marion* at 316–317, 92 S.Ct. at 462, 30 L.Ed.2d at 476–477; *State v. Luck* (1984), 15 Ohio St.3d 150, 15 OBR 296, 472 N.E.2d 1097.

30. See *United States v. Lovasco* (1977), 431 U.S. 783, 789–790, 97 S.Ct. 2044, 2048–2049, 52 L.Ed.2d 752, 758–759; *United States v. Marion* (1971), 404 U.S. at 324, 92 S.Ct. at 465, 30 L.Ed.2d at 480–481; *State v. Luck,* at paragraph two of the syllabus.

31. See *United States v. Lovasco, supra; State v. Luck* at 153–154, 15 OBR at 298–300, 472 N.E.2d at 1102.

32. See *State v. Whiting* (1998), 84 Ohio St.3d 215, 217, 702 N.E.2d 1199, 1201.

a loss, we conclude that Neeley has failed to demonstrate actual prejudice. Further, even if Neeley had demonstrated some prejudice, the record does not reflect that any delay between the commission of the crime and his subsequent indictment was intentionally caused by the prosecution in order to gain a tactical advantage or that the state had negligently ceased its active investigation of the case. In short, no violation of due process arose from any alleged delay in bringing an indictment against Neeley.

 Finally, there was no speedy-trial violation for the postindictment delay. To trigger a speedy-trial analysis as a matter of constitutional law, the defendant must demonstrate that the delay between the indictment and the trial was prejudicial. A delay of more than one year is generally considered presumptively prejudicial.[33] But presumptive prejudice alone does not establish a speedy-trial violation.[34] Before we can hold that Neeley was denied his constitutional right to a speedy trial, we must weigh the following: (1) the length of the delay, (2) the reason for the delay, (3) Neeley's assertion of his constitutional right, and (4) prejudice to Neeley.[35]

 Neeley was indicted for aggravated murder on September 2, 1997. His trial was set to commence on November 29, 1999. While the length of the delay between the indictment and the time set for trial was presumptively prejudicial, the degree of prejudice was negligible because Neeley was appropriately incarcerated for the entire time and because the delay was unavoidable due to extradition complications. Neeley had been incarcerated on unrelated charges in Kentucky since 1997, after his appeal bond was revoked when he was indicted for Smith's murder. According to the state, Neeley had fought extradition for two years, and after his final appeal was denied, he was extradited to Ohio and a trial date was set. Given that, Neeley cannot overcome the fact that the delay was caused by his own actions. Further, because there is nothing in the record that would indicate that the delay resulted from negligence on the part of the state, we are unpersuaded that Neeley's constitutional right to a speedy trial was violated. The twelfth assignment of error is, therefore, overruled.

Neeley's final assignment is that the cumulative and incremental effect of the errors committed at his trial deprived him of a fundamentally fair trial and

**33.** See *State v. Triplett* (1997), 78 Ohio St.3d 566, 569, 679 N.E.2d 290, 293, citing *Doggett v. United States* (1992), 505 U.S. 647, 652, 112 S.Ct. 2686, 2691, 120 L.Ed.2d 520, 528–529.

**34.** See *State v. Triplett* at 570, 679 N.E.2d at 294, quoting *Doggett v. United States* at 656, 112 S.Ct. at 2693.

**35.** See *State v. Triplett* at 568, 679 N.E.2d at 292–293, citing *Barker v. Wingo* (1972), 407 U.S. 514, 530–532, 92 S.Ct. 2182, 2192–2193, 33 L.Ed.2d 101, 116–118.

requires a reversal of his conviction. Because we have overruled Neeley's twelve other assignments of error, there is no cumulative error to recognize in this case.[36]

## CONCLUSION

Having overruled Neeley's thirteen assignments of error, we therefore affirm the judgment of the trial court.

*Judgment affirmed.*

WINKLER, J., concurs.

PAINTER, P.J., dissents.

PAINTER, Presiding Judge, dissenting.

The majority states, "[W]e caution prosecutors to refrain from making such misstatements of the evidence and the law in the future." But as Chief Justice Moyer has written in his eloquent dissent in *State v. Fears*, "Refusing to address the fundamental unfairness of a trial riddled with prosecutorial misconduct because a majority of this court deems the evidence of guilt to be overwhelming creates the perception that we protect the right to a fair trial only when we believe that the defendant is not guilty. However, our constitutional duty is to ensure that all defendants, regardless of guilt or innocence, receive a fair trial, and to ensure that a person accused is presumed innocent until the state, within the bounds of due process, satisfies its burden of proving beyond a reasonable doubt all of the elements of the charged offense * * *."[37]

Here, the evidence is not overwhelming, but we continue to condone what the majority correctly calls prosecutorial excesses. In an effort not to be "soft on crime," we have become soft on the law.

The majority says that it is "deeply concerned by the improper remarks," but then refuses to do the one thing that would show that concern and send a message that such conduct will not be tolerated—grant a new trial. Only when actions have consequences will they be deterred.

I also refuse to condone the prosecutor's thinly veiled reference to Neeley's refusal to testify. The majority properly states that it was error but somehow holds this blatant constitutional violation harmless. The majority simply states

---

36. See, generally, *State v. Davis* (1991), 62 Ohio St.3d 326, 348, 581 N.E.2d 1362, 1380.

37. *State v. Fears* (1999), 86 Ohio St.3d 329, 353, 715 N.E.2d 136, 154.

that the evidence "although circumstantial, was sufficient to sustain the jury's verdict, and the verdict was not against the manifest weight of the evidence." That is not the standard. In order to hold the comment harmless, we must find that "the prosecutor's improper comments were harmless beyond any reasonable doubt."[38] Surely, in a purely circumstantial case, the error is not harmless beyond any reasonable doubt. Our constitutional duty is to reverse.

Additionally, we should grant a new trial because of the manifest prejudice in playing the videotape. The majority simply shrugs this off in one sentence. The still photographs—fourteen of them—are gruesome enough, but I can almost go along with the holding that they were not overly prejudicial. The video crosses any line—I was not able even to make it through the whole tape. Any probative value was far outweighed by the live maggots. The only reason to play the tape was to inflame the jury. We condone this conduct far too often.[39]

The "other acts" evidence of the Kentucky conviction was admissible to show motive, but the underlying facts of the conviction were not. There is no doubt that the prosecutor's comment that Neeley "went on trial for shooting another man with a shotgun" was improper. The majority ignores this statement. Too often, this court allows the state to get away with using other-acts evidence improperly.

The "opinion" testimony of the officer that Smith had no other enemies was also improper. I would not reverse on that alone, but it just adds to the cumulative effect—the effect of the sum of the errors mandates reversal.

The trial was fraught with error. It was not a fair trial. The majority opinion tortuously weaves its way around some errors, dodges others, and runs careeningly off the road of the law. We should sustain Neeley's fifth, seventh, eighth, eleventh, and thirteenth assignments of error and remand for a new trial free of those errors.

---

38. *State v. Zimmerman* (1985), 18 Ohio St.3d 43, 44–45, 18 OBR 79, 80, 479 N.E.2d 862.

39. See *State v. Reaves* (1998), 130 Ohio App.3d 776, 721 N.E.2d 424 (Painter, J., concurring in part and dissenting in part).