JOURNAL ENTRY and OPINION
{¶ 1} Defendant-appellant James Daniels, also known as James Cook, appeals from his recent conviction after a jury trial for the November 1986 gunshot murder of Denise Minor.
 {¶ 2} Appellant raises three challenges to his conviction. He first argues the state delayed unnecessarily in bringing him to trial in 2003 since the indictment against him was filed in 1987. He further claims his conviction is supported by neither sufficient evidence nor the weight of the evidence presented at trial. This court has thoroughly reviewed the record, however, and disagrees with appellant. Consequently, his conviction is affirmed.
 {¶ 3} The record reflects appellant's conviction stems from the relationship he developed in 1984 with Kenneth McMillan while both men were housed in the same Florida prison. Appellant had been incarcerated for various theft offenses; McMillan was involved in the drug trade. The testimony adduced at trial suggests that appellant, who used the name "J.C. Daniels," or, simply, "J.C.," became McMillan's "protector" during his incarceration.
 {¶ 4} McMillan originally lived in Cleveland, Ohio. Upon his release from the Florida correctional facility in the fall of 1985, he returned to this area. Soon after, McMillan rented a house owned by his brother located on Hyde Park Avenue in the City of Cleveland Heights.
 {¶ 5} McMillan continued his drug business from this location. Since he "moved" two to four kilograms of cocaine approximately every two weeks, he often would travel in order to meet his out-of-state suppliers. On one of these "business" trips, McMillan happened to meet appellant in a Florida bus station.
 {¶ 6} Appellant at that time was in flight from his sentencing on a bank robbery conviction. Therefore, when he renewed this acquaintance, he mentioned he was on his way out of Florida. McMillan at the time had been thinking about obtaining some "security" for his business, so he offered appellant the job. Appellant quickly accepted.
 {¶ 7} With McMillan's help, appellant took an airplane flight from Atlanta, Georgia and relocated to Cleveland in the summer of 1986. McMillan gave appellant one of the bedrooms in the Hyde Park home; in exchange, appellant delivered the drugs to McMillan's buyers. In this way, appellant became acquainted with many of McMillan's friends and customers.
 {¶ 8} One of these was Owen Watts. Watts lived with his wife in an apartment building in Shaker Heights. While they resided there, Watts met a friend from junior high school days, Ronnie Miller. Miller had recently moved into the building with his girlfriend, Denise Minor. Watts, Miller and Minor eventually discovered they had a common pastime: "free-basing" cocaine. Watts, naturally, introduced Miller and Minor to McMillan. In this way, appellant met Minor.
 {¶ 9} Although she was living with Miller, Minor immediately was attracted to appellant. The two of them began a relationship. Minor confided in her long-time girlfriend, Felicia Simmons,[1] that she was "in love with" appellant. Their romance, however, did not proceed smoothly. Simmons observed that Minor, whom she characterized as an "aggressive" and "bold" person who "said what was on her mind," became "very possessive" of appellant.
 {¶ 10} The circumstances of the relationship, based as it was on drugs and betrayal, soon led to a great deal of tension. On one occasion, Simmons heard Minor threaten appellant in McMillan's presence that she would "call the cops" on them. Appellant responded by backing Minor against a wall and telling her "he'd kill her, he'd blow her F-ing head off." Based upon this episode, Simmons thought their relationship was "too volatile."
 {¶ 11} The tension eventually affected people around them. Minor moved from her apartment with Miller to her parents' home. Minor's mother wanted to meet appellant, but, afterward, "didn't feel good about" him. McMillan warned Minor to "stay away from" appellant; when he received little assurance that she would do so, McMillan told appellant Minor no longer was welcome in the Hyde Park home. In an unguarded moment, Watts heard appellant say that he didn't want "a crazy broad" like Minor, because her behavior made him "want to kill her." Watts thought appellant was joking, because he made the statement in a car crowded with others, including Minor.
 {¶ 12} Simmons also had misgivings about her friend's obsession with appellant. Thus, on November 2, 1986, when Minor telephoned late in the day to complain that appellant had been avoiding her, Simmons advised Minor to "stop chasing" him. This suggestion angered Minor enough that she abruptly terminated the conversation. Simmons subsequently discovered that Minor, that same night, requested her elder sister to drive her to McMillan's house. Minor's mother noticed Denise did not return home.
 {¶ 13} McMillan had driven to West Virginia on "business" that day. He returned on the evening of November 5, 1986. Upon unlocking the door, he was greeted by an unpleasant smell that emanated from the upstairs. McMillan discovered Minor's body on the floor of the room in which appellant had been staying. The subsequent autopsy indicated she had been shot in the head at close range approximately three days previously. Appellant, who along with McMillan's brother possessed a key to the house, was nowhere to be found.
 {¶ 14} Appellant, however, left two telephone messages for Watts after the murder. In the first, appellant said, "You see what I did, [C]ool? You're next, [C]ool." In the second, which came after Miller informed Watts that Minor was dead, appellant again asked, "Do you see what I did, [C]ool?"
 {¶ 15} Police detective Mark Schmitt took over primary investigation of the killing. McMillan had an alibi, and none of the witnesses wished to incriminate himself or herself in the drug business; consequently, especially with McMillan's encouragement, each gave incomplete information. Moreover, appellant left his clothing at McMillan's house, but little else.
 {¶ 16} On January 29, 1987, Schmitt obtained a grand jury indictment against appellant that charged him with one count of murder with a gun specification.[2] Based upon witness identification that coincided with a New York photo identification card found in a bureau drawer in appellant's room, the indictment stated appellant's name as "James C. Daniels." A month later, the common pleas court issued a capias for appellant's arrest.
 {¶ 17} Schmitt's efforts to locate appellant, however, proved unavailing because the identification card was false. Without either a legitimate social security number, a true fingerprint, or an accurate birth date, Schmitt had only appellant's photograph and the information that McMillan invited appellant to relocate after encountering him at a bus station in "Georgia." Schmitt could find no birth certificate and no criminal record for anyone who resembled appellant named "James C. Daniels."
 {¶ 18} In 1988, therefore, Schmitt additionally obtained a federal warrant for appellant's arrest on a charge of unlawful flight to avoid prosecution. Schmitt utilized the resources of the Federal Bureau of Investigation (the "FBI") in his search for appellant in this manner. Nevertheless, his investigation was hampered by two circumstances. First, no federal agent remained on the case for long. Second, the FBI's databases were not fully computerized. Appellant's whereabouts continued to be a mystery for nearly 13 years.
 {¶ 19} Finally, in late 2000, FBI agent Laura Henry took over the case. She met with Schmitt about it in early 2001. In reviewing all the evidence obtained by Schmitt during the time since the murder, Henry noticed something no one else had. A small Biblical pamphlet discovered in the bureau drawer along with the identification card contained several numbers. In Henry's experience, one of the numbers appeared to be an inmate number like those assigned to prisoners in the southern states in the early 1980s. She checked into this lead and ultimately discovered the Bible had been issued to a Florida inmate named "James Cook." This name had been inscribed in the pamphlet. The man currently was incarcerated in Florida. When she obtained "James Cook's" photograph, it matched appellant's.
 {¶ 20} McMillan by this time had become a legitimate business owner. Schmitt approached him with this new information. Once he was assured he could no longer be prosecuted for his earlier criminal activity, McMillan admitted he had first met appellant in a Florida prison, had hired him for the drug business, and had told him to go to Atlanta for the flight to Cleveland McMillan also identified appellant as the man he knew as "James Daniels." The other witnesses with whom Schmitt spoke also identified appellant as the person known as "J.C."
 {¶ 21} Both Schmitt and Henry proceeded to Florida to meet with appellant. Appellant spoke to them voluntarily. He admitted knowing Minor, but gave conflicting stories about what occurred on the night of the murder. In whatever version he told them, appellant indicated Minor had been alive when he left McMillan's house.
 {¶ 22} Schmitt obtained appellant's extradition from Florida in September 2002. The record reflects that during the discovery process that followed his arraignment, appellant executed a written waiver of his right to a speedy trial "from November 15, 2002 to February 14, 2003." Nevertheless, on January 21, 2003 appellant filed a motion to dismiss his case "due to lack of speedy trial." The trial court held a hearing on appellant's motion before overruling it.
 {¶ 23} After a lengthy trial during which the state presented the testimony of eight witnesses and appellant testified in his own behalf, the jury ultimately found appellant guilty of murder with a gun specification.
 {¶ 24} Appellant challenges his conviction with three assignments of error. The first states:
 {¶ 25} "I. Appellant's right to a speedy trial was violated due to post indictment delay."
 {¶ 26} Appellant argues the time lapse between his 1987 indictment and his 2003 trial is unconstitutional. He contends that since he was incarcerated for many of those years, the state did not adequately justify its failure to find him. This court disagrees.
 {¶ 27} In order to trigger a constitutional speedy trial analysis of post-indictment delay, the defendant must demonstrate the delay between his indictment and trial was prejudicial. State v. Triplett,78 Ohio St.3d 566, 1997-Ohio-182. A delay of more than one year is considered presumptively prejudicial, but it is only one of the factors for the court to weigh; the court also must take into account the reason for the delay, the defendant's assertion of his right to speedy trial, and the actual prejudice the delay may have caused the defendant. Id. Thus, when the defendant's own actions are a major cause of the delay, and the record fails to reflect negligence on the part of the state, the court is justified in determining constitutional speedy trial rights were not violated. State v. Neeley (2001), 143 Ohio App.3d 606.
 {¶ 28} The record in this case reveals several facts that support the trial court's decision. Appellant originally came to Ohio only a few months before the crime. Appellant was a Florida felon who had in his possession a false identification card that had purportedly been issued in New York state, and appellant used that particular alias while in Cleveland Immediately after the murder, appellant fled Ohio.
 {¶ 29} Schmitt's testimony, moreover, proved he exercised due diligence in his efforts to determine appellant's whereabouts. Appellant was apprehended in a different state on another charge and returned to an out-of-state prison, but Schmitt had no way of finding him. Nevertheless, Schmitt continued to seek appellant during the years that followed by utilizing all means available, including, eventually, Henry's serendipitous investigative experience.
 {¶ 30} From these facts, the trial court correctly concluded appellant's speedy trial rights had not been violated; rather, appellant's own actions were a major cause of the delay in bringing him to trial. Id.; State v. Wilson (Mar. 27, 1997), Cuyahoga App. No. 69346.
 {¶ 31} Appellant's first assignment of error, therefore, is overruled.
 {¶ 32} Appellant's second and third assignments of error state:
 {¶ 33} "II. The trial court erred in denying appellant's motion for acquittal as to the charge of murder when the state failed to present sufficient evidence that appellant was involved in the crime.
 {¶ 34} "III. Appellant's conviction for murder is against the manifest weight of the evidence."
 {¶ 35} In these assignments of error, appellant challenges both the sufficiency and the weight of the evidence presented at trial. He essentially argues that since no one saw him shoot Denise Minor, the trial court improperly denied his motion for acquittal, and his conviction should be reversed. Appellant's argument is unpersuasive.
 {¶ 36} A defendant's motions for acquittal should be denied if the evidence is such that reasonable minds could reach different conclusions as to whether each material element of the crimes has been proven beyond a reasonable doubt. State v. Dennis, 79 Ohio St.3d 421, 1997-Ohio-372;State v. Jenks (1991), 61 Ohio St.3d 259; State v. Bridgeman (1978),55 Ohio St.2d 261. The trial court is required to view the evidence in a light most favorable to the state. State v. Martin (1983),20 Ohio App.3d 172. Thus, circumstantial evidence alone may be used to support a murder conviction. State v. Anderson (May 12, 1994), Cuyahoga App. Nos. 65378, and 65379.
 {¶ 37} With regard to an appellate court's function in reviewing the weight of the evidence, this court is required to consider the entire record and determine whether in resolving any conflicts in the evidence, the trier-of-fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin, supra, at 175.
 {¶ 38} This court must be mindful, therefore, that the weight of the evidence and the credibility of the witnesses are matters primarily for the trier-of-fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 39} In this case, the evidence demonstrated appellant was the only person who could have murdered Denise Minor. McMillan and Watts testified since the house contained valuable drugs, it could be unlocked and locked only by key. Appellant was one of only three people who had a key to McMillan's house. McMillan's brother possessed a key merely because he was the owner of the house; no one testified he either visited or knew Minor. McMillan had left for West Virginia before Minor was left at the house by her sister. None of Minor's friends or family heard from her thereafter. McMillan testified the house was locked upon his return.
 {¶ 40} Appellant, moreover, had an intimate relationship with Minor that was "volatile." Simmons testified Minor's behavior caused appellant to explode in anger; McMillan testified he had warned Minor that she was placing herself in danger with her actions around appellant. On separate occasions, Watts and Simmons both heard appellant threaten to kill Minor. Watts and McMillan knew appellant carried a gun. Appellant acknowledged in his various statements to Henry and Schmitt that he needed his key in order to enter and exit the house.
 {¶ 41} Based upon the evidence presented at trial, the trial court correctly concluded appellant's guilt of the crime was for the jury to determine. Similarly, in view of the several variations in appellant's version of what occurred, the jury acted within its prerogative to credit the testimony of the state's witnesses rather than appellant.
 {¶ 42} For the foregoing reasons, appellant's second and third assignments of error also are overruled.
 {¶ 43} Appellant's conviction of murder with a gun specification is affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Timothy E. McMonagle, J. and Patricia Ann Blackmon, J. Concur.
[1] Simmons' surname by the time of trial was "Southern."
[2] Two other specifications were dismissed prior to trial.