JOURNAL ENTRY and OPINION
{¶ 1} Defendant-appellant Lonnie Prather appeals from his convictions after a jury trial for murder with a firearm specification, tampering with evidence, and possession of criminal tools.
 {¶ 2} Appellant raises three assignments of error in which he challenges his convictions on the following grounds: 1) the trial court improperly admitted into evidence a threatening statement appellant made regarding the victim; 2) the prosecutor engaged in misconduct; 3) trial counsel provided ineffective assistance; and, 4) the conviction for murder is not in accord with the weight of the evidence.
 {¶ 3} Following a review of the record, this court finds none of appellant's challenges has merit. Consequently, his convictions are affirmed.
 {¶ 4} Appellant's convictions stem from his relationship with the victim, A.C.[1] Although married to another woman, appellant publicly presented himself in the small geographic area where he lived as A.C.'s partner and "boyfriend."[2]
Appellant participated in a business enterprise with A.C., often stayed with her in the house in which she lived with her children, shared a circle of friends with her, and, since he lacked a valid driver's license, depended upon her for much of his transportation around the neighborhood.
 {¶ 5} The business appellant and A.C. owned together was an automobile body shop. A.C. operated the day-to-day affairs of the office, which required her to put in many hours, while appellant performed repairs on customers' vehicles with the aid of a few of his colleagues who did "contract work" for him. Appellant also sold drugs to his friends, including A.C. For enjoyment, the two of them socialized several times a week at a local tavern, Mr. Peabody's Pub. In the late fall of 2002, friends noticed an increase in "tension" between appellant and A.C.; A.C. often appeared "stressed."
 {¶ 6} On the afternoon of December 14, 2002, the Cleveland Police Department twice received calls to respond to the body shop because appellant and a business associate exchanged especially heated words. Both times, before the police arrived, appellant left A.C. to deal with the situation; he retreated to a bar while A.C. resolved the matter.
 {¶ 7} During the second exchange, appellant became angry enough at the business associate to order his colleague Robert Zak to "go get his gun out of the drawer in the shop" for him. Zak and the other contract workers knew appellant kept two handguns in his desk; one was a 9 millimeter semiautomatic with a "laser sight" attached, and one a small revolver. Zak declined, but offered to drive appellant to Mr. Peabody's Pub.
 {¶ 8} Appellant arrived there with Zak at approximately 5:00 p.m. In furtherance of plans they made to engage in target practice later in the evening, appellant called A.C. on his cellular telephone to remind her "to bring the guns and the case up to the bar."
 {¶ 9} A.C. arrived at the pub about 6:00 p.m. She sat next to appellant at the bar and seemed "upset;" on that basis, Zak decided it was time for him to go. Appellant accompanied him out to the rear parking lot. Before Zak left, appellant went to A.C.'s van, retrieved a black duffle bag from it, and rummaged through the bag to obtain some cocaine for Zak. Zak saw the 9 millimeter handgun inside the bag.
 {¶ 10} Upon appellant's return to the bar, he and A.C. had an "intense" conversation; A.C. occasionally appeared to be "crying," and appellant seemed to be attempting to quiet her. Denise Polley, one of the bartenders and an acquaintance of the couple, sought to distract A.C.; at 7:00, when she went off duty, Polley asked A.C. to accompany her to her apartment to change clothing.
 {¶ 11} Polley and A.C. returned within the hour. A.C.'s intense conversation with appellant again resumed. At one point, appellant expressed his feelings about their conversation by "slamming" a roll of quarters on the bar hard enough to break the tube and send the coins flying.
 {¶ 12} Appellant later told the police A.C. was "extremely upset over the scene at the business earlier and that she was very upset about being paid late, about having her electricity cut off." A.C. finally rose, and, according to appellant, stated, "F * * * it. I'm done with this."
 {¶ 13} At 10:31 p.m., appellant left the building, A.C. following behind; they exited by way of the door that led to the rear parking lot. The time was fixed by the videotape surveillance system the pub's owner, William Georgeson, recently had installed on the premises. Appellant wore his cellular telephone clipped to his shirt pocket. Minutes later, the tape displays Christopher Wells, their friend who also was Polley's boyfriend, next went out the rear door; however, Wells reentered the building after only a minute.
 {¶ 14} At 10:42 p.m., the videotape film shows appellant returned to the building alone. He carried a black duffle bag and entered the men's room. While he was inside, Wells, Polley and another friend, Brian Burke, went out the rear door, intending to "smoke a joint." Georgeson used the men's room during this time; while he was there, he heard someone making "splashing" noises coming from the room's single stall.
 {¶ 15} As the three friends walked out into the parking lot, they saw a couple pass them appearing distressed. Polley heard the man say, "There's somebody messed up in that van over there," and noticed he indicated A.C.'s vehicle. Curious, they approached it. Wells went to the open driver's door, while Burke circled to the passenger's side, trailed by Polley.
 {¶ 16} Burke had not yet reached it when he observed a large pool of blood on the asphalt of the parking lot. He immediately used his cellular telephone to dial emergency services. Polley looked into the van's passenger area to see A.C. "smashed" on the floor, her head covered in blood and her upper clothing tangled under her arms. Wells ran back into the building.
 {¶ 17} The videotape film indicates Wells frantically searched for appellant inside the pub. After Georgeson was summoned out to the parking lot, at 10:47 p.m., Wells discovered appellant in the men's room. As the two of them exited, Wells carried the black duffle bag out. Wells headed into the bar area.
 {¶ 18} Appellant ran outside to the van, calling out," Oh my God. [A.C.] shot herself." Polley had covered A.C.'s naked torso with a blanket, so appellant attempted to cradle her while they waited for the ambulance to arrive. Meanwhile, Wells returned outdoors without the bag, but carrying bar towels; someone wrapped them around A.C.'s head in an effort to protect the open wound.
 {¶ 19} The paramedics arrived shortly thereafter. One of them, Carl Casteele, approached the van to see appellant holding the victim. Casteele heard appellant making comments to the effect the injury was self-inflicted. However, Casteele thought the scene puzzling, with the victim only half-dressed and positioned as she was.
 {¶ 20} The paramedics immediately transported A.C. to the hospital, but she failed to recover from the wound. The coroner's subsequent autopsy indicated A.C. had suffered from a gunshot wound to her right temple, with the bullet passing completely through her brain and exiting through the left scalp. The injury was not a contact wound, but the presence of soot on the right side of her head indicated the gun was fired from one-eighth to six inches away.
 {¶ 21} While Georgeson and his patrons waited for the police to arrive, appellant turned to Polley and handed her a small revolver. He reassured her it "wasn't loaded," and asked Burke to take him to the hospital. Burke agreed.
 {¶ 22} Polley at that point "wasn't thinking clearly," so when Wells then suggested she "go home and get away," she simply obeyed. Wells handed her keys, threw a black duffle bag into the nearby vehicle, and urged her on her way. She later placed the gun appellant had given to her into the black duffle bag. When she did so, she observed the bag already contained a larger gun. Wells appeared at her apartment soon afterward to take custody of the bag.
 {¶ 23} By the time the police officers arrived to obtain information about the incident, Georgeson's handyman approached him in the parking lot to indicate there was something in the men's room he needed to see. Georgeson followed the man inside to see bloody smears on areas of the stall. The stall's wastebasket, moreover, contained drug paraphernalia, including a scale and small plastic" ziploc" bags. Georgeson immediately informed the officers of the discovery. Furthermore, he agreed to provide them with the videotape from his surveillance camera.
 {¶ 24} The officers also located in the parking lot near A.C.'s van a spent 9 millimeter casing, a woman's hair clip, a small plastic "ziploc" bag, and a blood-stained dollar bill. After viewing the videotape, they relayed a message to detain appellant to Doug Balogh, the officer who was interviewing him outside of the hospital.
 {¶ 25} By that time, appellant voluntarily had made several statements to Balogh. According to appellant, the afternoon incidents at the body shop had "upset" A.C. She had "excused herself" to the ladies' rest room, and" after five minutes" of sitting alone at the bar, he began looking for her. When he found her near her van on the asphalt of the parking lot "in a pool of blood," he "panicked and tried to load her into" the vehicle, but, even with the help of "two unidentified white males," could not do so. He then "ran back inside the bar to have someone call 911;" upon returning to the lot, the two males were driving "hurriedly away." Appellant remembered nothing after that.
 {¶ 26} When the police located Wells and he became aware of the existence of the pub's videotape, he led them to the place he had hidden the black duffle bag carried by appellant. Later forensic analysis demonstrated the 9 millimeter gun in the duffle bag had fired the shell casing found on the asphalt near A.C.'s van. Analysis of the blood smears in the men's room stall proved they had come from A.C.
 {¶ 27} Appellant and Wells subsequently were charged together in a five-count indictment. Appellant was charged with murder with a firearm specification, tampering with evidence, possession of drugs, and possession of criminal tools. The trial court granted appellant's motion for a separate trial.
 {¶ 28} Prior to the commencement of appellant's jury trial, the state dismissed the drug possession charge. The jury heard the testimony of eighteen prosecution witnesses and five defense witnesses, and reviewed numerous items of physical evidence, including the videotape, before finding appellant guilty of the remaining charges.
 {¶ 29} Appellant now challenges his convictions with three assignments of error.
 {¶ 30} Appellant's first assignment of error states:
 {¶ 31} "I. The verdict on the charge of murder is against the manifest weight of the evidence."
 {¶ 32} Appellant argues the evidence presented at trial of murder was lacking; rather, it more logically demonstrated A.C. committed suicide. This court disagrees.
 {¶ 33} With regard to an appellate court's function in reviewing the weight of the evidence, this court is required to consider the entire record and determine whether in resolving any conflicts in the evidence, the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Martin, (1983), 20 Ohio App.3d 173, 175.
 {¶ 34} This court must be mindful, therefore, that the weight of the evidence and the credibility of the witnesses are mattersprimarily for the jury to consider. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus (emphasis added).
 {¶ 35} In this case, the physical evidence demonstrated that appellant left the pub with A.C., returning by himself approximately ten minutes later to enter the men's room with the black duffle bag; A.C.'s blood was smeared in the men's room stall, and the bag contained the gun that had killed A.C.
 {¶ 36} Their friends testified that appellant had requested A.C. bring his guns to the pub, he and A.C. had problems at their business, they had been involved in an intense conversation in which he displayed anger while she was upset, and, upon being the last of the social circle to discover her body, appellant was the only person who provided an explanation for the incident: he suggested to them A.C. shot herself.
 {¶ 37} However a great deal of evidence contradicted appellant's suggestion, viz., A.C.'s position and the condition of her clothing, the fact that no gun was in the vicinity, and the lack of a contact wound. A.C.'s own doctor noted she had "no suicidal tendencies." Significantly, appellant failed to mention the suicide theory to Balogh, lied about A.C. having left the pub by herself, and, despite having his own cellular telephone when he left the pub, made no "911" call about A.C.'s condition. He did call Wells, though, asking if Wells had taken care of the item appellant had given to him.
 {¶ 38} This court cannot find upon a review of the record, therefore, that the jury lost its way in determining appellant murdered A.C. with the 9 millimeter gun. State v. Daniels,
Cuyahoga App. No. 82586, 2003-Ohio-6479.
 {¶ 39} Accordingly, appellant's first assignment of error is overruled.
 {¶ 40} Appellant's second assignment of error states:
 {¶ 41} "II. The prosecution violated appellant's constitutional rights under Article I, Section 10 of the Ohio Constitution, the Fifth Amendment to the United States Constitution, and the Due Process Clause of theFourteenth Amendment to the United States Constitution when it engaged in improper closing argument that placed the burden of proof upon the defense, and appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution when counsel failed to object."
 {¶ 42} Appellant argues the fairness of his trial was compromised by a comment made during closing argument by the prosecutor that went unchallenged by defense counsel. Appellant contends the comment amounted to an improper shifting of the burden of proof to him. Upon a review of the context in which the comment was made, however, it does not rise to the level of reversible error.
 {¶ 43} The conduct of a prosecuting attorney during a trial generally cannot be made a ground of error unless the conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair. State v. Papp (1978),64 Ohio App.2d 203, cited with approval in State v. Maurer (1984),15 Ohio St.3d 239. Moreover, it has been held a trial court must afford the prosecutor some latitude and freedom of expression during argument. State v. Apanovich (1987), 33 Ohio St.3d 19;State v. Vrona (1988), 47 Ohio App.3d 145.
 {¶ 44} Therefore, a defendant shall be entitled to a new trial only when a prosecutor makes improper remarks and those remarks substantially prejudice the defendant. State v. Tibbets
(2001), 92 Ohio St.3d 146; State v. Smith (1984),14 Ohio St.3d 13. Thus, the test is whether, absent the prosecutor's remarks, the jury would have found appellant guilty. State v. Maurer
(1984), 15 Ohio St.3d 239, 267.
 {¶ 45} As to appellant's additional claim of ineffective assistance of counsel, it requires proof that counsel's" performance has fallen below an objective standard of reasonable representation" and, in addition, prejudice arises from that performance. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus; see, also, State v. Lytle
(1976), 48 Ohio St.2d 391. The establishment of prejudice requires proof "that there exists a reasonable probability that were it not for counsel's errors, the result of the trial would have been different." State v. Bradley, supra, paragraph three of the syllabus.
 {¶ 46} The burden is on appellant to prove ineffectiveness of counsel. State v. Smith (1985), 17 Ohio St.3d 98. Trial counsel is strongly presumed to have rendered adequate assistance. Id.
Moreover, this court will not second-guess what could be considered to be a matter of trial strategy.
 {¶ 47} In this case, appellant takes issue with some of the prosecutor's statements during the final portion of closing argument to which his trial counsel raised no challenge. The remarks are set forth in context as follows:
 {¶ 48} "And this is somewhat interesting, too. Inside this little bag are clean latex gloves. Yet, in the back of the van was found a latex glove with [A.C.]'s blood on it and in the trash can was a latex glove with * * * [A.C.]'s blood on it.
 {¶ 49} "So [appellant], you can draw an inference at some point in time, put these gloves on, perhaps after he shot [her]. Why? Under that (sic) circumstance, the woman that you are so close to and she's bleeding, why would he put these rubber gloves on?
 {¶ 50} "Does [defense counsel] give you an explanation for that * * * ? Does [defense counsel] ever give you any explanation as to why this gun is being removed from the scene, a logical theory on that?
 {¶ 51} "All this nonsense about talking about * * * a woman who shoots herself. Well, fine * * *, where's the gun? * * * Why remove the gun? * * *"
 {¶ 52} Since a review of the record demonstrates the remarks appellant challenges were made for the most part in answer to arguments made by defense counsel during his closing, they were not intended to shift the burden of proof. State v. Mason,82 Ohio St.3d 144, 162-163, 1998-Ohio-370. They simply were directed at the strength of the state's evidence.
 {¶ 53} The record, therefore, does not support a conclusion that the prosecutor's comments exceeded the bounds of permissible argument as the advocate of the state. Certainly, defense counsel was aware of that; therefore, counsel would have no basis for an objection. State v. Gray, Cuyahoga App. No. 83097, 2004-Ohio-1454. Counsel earlier made a tactical decision to present a theory of the case that, despite having flaws, meshed with appellant's suggestion of suicide made at the scene.
 {¶ 54} Under these circumstances, appellant can demonstrate neither that the prosecutor's conduct nor defense counsel's performance compromised the fairness of his trial.
 {¶ 55} Accordingly, appellant's second assignment of error also is overruled.
 {¶ 56} Appellant's third assignment of error states:
 {¶ 57} "III. The trial court erred and violated appellant's due process rights when it permitted the state to present evidence of a conditional threat made eleven months before the alleged murder."
 {¶ 58} Appellant challenges the trial court's decision to allow testimony that appellant had threatened A.C.'s life several months before her death with the observation that "if she ever turns, [he'd] have to kill her."
 {¶ 59} The trial court's decision whether to admit or to exclude evidence, however, is a matter left within its sound discretion. Columbus v. Taylor (1988), 39 Ohio St.3d 162;State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. No abuse of discretion occurred in this case.
 {¶ 60} Evid.R. 404(B) permits the introduction into evidence of statements that tend to prove, inter alia, preparation or motive. State v. Broom (1988), 40 Ohio St.3d 277, paragraph one of the syllabus.
 {¶ 61} The main issue in this case was whether appellant was involved in A.C.'s shooting. Along with the evidence that showed their conversation that night had been troubled, and, further, that he had carried the gun responsible for her death, any reason appellant may have had for wanting A.C. dead was highly relevant to the appellant's underlying motive and preparation for her death. Consequently, the trial court did not err in admitting appellant's declaration. State v. Williams (1995),73 Ohio St.3d 153; State v. Martin (Jan. 27, 2000), Cuyahoga App. No. 73455.
 {¶ 62} Accordingly, appellant's third assignment of error also is overruled.
 {¶ 63} Appellant's convictions are affirmed.
 Celebrezze, JR., P.J. and Sweeney, J. concur.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
[1] Pursuant to this court's policy, the female victim is referred to by only her initials.
[2] Quotes are taken from testimony given by a witness at trial.