OPINION.
{¶ 1} Defendant-appellant Philip George appeals his convictions for gambling, operating a gambling house, money laundering, conspiracy, and engaging in a pattern of corrupt activity.
 {¶ 2} This is one of the most bizarre cases in recent memory. There are the usual evidentiary and procedural issues, but also alleged terrorist connections and a series of searches and seizures too bizarre to be fictional. The trial court referred to the defendant's counsel and their tactics as "silly," "adrift," and "amazing." We could not think of more appropriate terms to describe this case.
 {¶ 3} But the factual complexity of the case does not obscure the legal simplicity of the outcome. We reverse this case on a simple procedural matter — the trial court's refusal to grant the defendant's requests for a continuance. And we must dismiss one of the charges for vagueness.
 {¶ 4} Before we begin our discussion of this case, a little background information is appropriate.
 I. Charities and Tip Tickets {¶ 5} In 1997, the Ohio Supreme Court held that bars and other liquor-permit-holding premises could participate in charitable gambling as long as neither the owners nor the employees were compensated for their participation.[1] This ruling opened the floodgates for a large volume of untapped charitable opportunities, as well as an equally large opportunity for abuse.
 {¶ 6} This case involved a tip-ticket scheme. A tip ticket is similar to a scratch-off lottery ticket: the customer purchases a ticket and pulls a tab on the ticket, which then reveals whether the customer is a winner or, more likely, a loser. The tickets come in sets with predetermined payouts and profits. So if every ticket from a particular set is sold, the charity knows exactly how much money it should make from each set.
 {¶ 7} For example, imagine a box of 3,000 tickets. If there is a predetermined profit of $1,000 on that set, there will be $1,000 remaining after the 3,000th ticket has been sold. The order is theoretically random, so any given ticket could be a $100 winner or a loser.
 {¶ 8} The system is not perfect because the 3,000th ticket could be a big winner or a loser. In the former scenario, there is little incentive to sell the final ticket because there is already a profit of more than $1,000. In the latter, there is no incentive for a customer to purchase the losing ticket (assuming the customer knows that it is a loser and assuming he is not Richard Pryor in Brewster's Millions). Legally, the seller must sell all the tickets. But if most of the tickets that remain in the set are winners and the till already has more money than the guaranteed profit, the seller may be tempted to pocket the difference and still give the charity its guaranteed profit.
 {¶ 9} Another possible abuse of the system comes from the accounting practices that the distributors of the tickets and the sellers use. A distributor could sell the tickets to the sellers, split the profits, or simply hide the profits from the charity — all of which are illegal.
 II. An Unusual Case from Indictment to Sentencing {¶ 10} The madness here started when the state decided to crack down on these abuses. George's personal involvement in this case concerned a tip-ticket scheme that supposedly benefited the United Saghbeen Society, the Child Care Foundation, and other charities. He was the alleged mastermind behind a statewide charity scam.
 {¶ 11} In October 2001, the state indicted George on 11 counts relating to his gambling activities in Hamilton County. Counts one and two were gambling charges relating to two different time periods.[2] Count three charged George with operating a gambling house.[3] Counts six through eight concerned money laundering.[4] Count 10 charged George with conspiracy;[5] and count 11 covered George's engaging in a pattern of corrupt activity.[6] The jury acquitted George of the other three counts, so they are irrelevant here.
 {¶ 12} The basic allegations were that George and a number of co-conspirators ran a gambling ring under the guise of charitable gambling for United Saghbeen, Child Care, and other charities. The state argued that George was in charge of everything from the distribution to the accounting. The state further argued that George gave only a small percentage of the actual profits from the tip-tickets to the charities, split profits with the bars that sold the tickets, paid so-called "volunteer" workers, and laundered money. The state claimed that George and his cohorts swindled the charities out of nearly $60 million.
 {¶ 13} Reading this decision up to this point, you probably have a much better idea of what this case is about than you could ever glean from the indictment or the bill of particulars. The indictment merely repeated the appropriate statutory language and gave some minor descriptions of the alleged illegal activity. George requested a bill of particulars, which again repeated the relevant statutory language and gave only a modicum of additional information.
 {¶ 14} In February 2002, Ohio Department of Public Safety agents searched George's home in relation to another case. George called an attorney, Charles Quinn, to come to the house and to observe the search. The agents seized numerous communications between George and his counsel relating to the current case. The state later returned these in a box because they were wrongfully taken. On the advice of his counsel, George preserved the documents in the box. He then moved to dismiss the case for violations of his due-process rights. George also moved to dismiss the indictment for vagueness.
 {¶ 15} Before the trial court heard arguments on the motions to dismiss, the Ohio Department of Public Safety again searched George's home in December 2002 on yet another investigation. Theyagain seized the same documents (now in a box) that had been returned to George, along with other documents allegedly relating to this case. George claimed that the documents seized included various trial-preparation materials that neither he nor his counsel could reproduce before his trial was set to begin in February 2003. He also insisted that the documents revealed important trial strategies.
 {¶ 16} George again moved to dismiss, this time on Fourth- and Sixth-Amendment grounds. This motion also asked that the court continue the trial date to allow defense counsel time to recover the materials that had been seized, returned, and then seized again. George also moved to continue the hearing on the motion to dismiss for the same reasons.
 {¶ 17} The trial court denied the motions to dismiss and denied the motions to continue the trial date because, according to the trial court, George had unclean hands and the attorney-client documents were in "plain view." The trial court also revoked George's bond.
 {¶ 18} George then filed a habeas-corpus petition to have his bond reinstated, which this court granted. But at a bond hearing following our order, the trial court set a new bond. This court ordered the trial court to show cause why it should not be held in contempt. The trial court then reinstated the bond after a hearing on the matter. Because of all of this, George was incarcerated for much of the time prior to his trial.
 {¶ 19} And this mess continued into the trial. The roughly 3,000 pages of transcript suggest that everyone was, at some point, exasperated either with the duration of the three-week trial or with each other. Both the prosecutor and George's trial counsel repeatedly objected. And the trial court repeatedly questioned George's trial counsel's tactics, often telling them to "shut up" or "be quiet" and suggesting that they did not have any sense.
 {¶ 20} During testimony, the trial court threatened a witness with contempt if she did not comply with his order to obtain financial records from the bar that she owned by the next morning. The bar was in Akron. The witness was in Cincinnati — without a car. And it was the middle of winter.
 {¶ 21} And near the end of the proceedings, the trial court admonished George's legally blind mother in front of the jury, threatening to find her in contempt and to put her in jail. She had evidently been talking to George's wife during the trial.
 {¶ 22} As for evidentiary matters, the trial court admitted a recorded statement where George himself discussed the operation of a large gambling ring. But the statement was recorded after George had been indicted and related to a different investigation. The trial court also admitted numerous other recordings (both video and audio) and sent unofficial transcripts of these recordings to the jury. George claimed throughout the trial that the state had not turned over George's statements or any of the unofficial transcripts in discovery.
 {¶ 23} The jury found George guilty on eight of the eleven counts. But the strangeness of this case did not end there. At sentencing, the prosecution introduced various banking records to show George's fiscal involvement. And the prosecution brought in an investigator who testified that the United Saghbeen Society had funneled money to certain Middle Eastern terrorist organizations, including Hezbollah (incorrectly spelled "Hizballah" by the investigator) and HAMAS.
 {¶ 24} George is a third-generation American and is Catholic. George requested a continuance at sentencing to allow him to gather evidence to rebut the state's accounting evidence and newfound terrorist claims. But the trial court refused, sentencing George to 25 years' imprisonment and a $50,000 fine.
 {¶ 25} George now appeals. He assigns four errors, each covering a range of arguments: (1) the trial court erred by failing to dismiss the indictment on Sixth-Amendment grounds; (2) the trial court erred by failing to dismiss the indictment where the indictment failed to meet constitutional requirements; (3) George did not receive a fair trial and due process; and (4) the trial court improperly imposed consecutive sentences. We will discuss the first three assignments, but George's fourth assignment is moot because we are granting a new trial.
 III. Right to Counsel {¶ 26} In his first assignment, George argues that the trial court should have dismissed the indictment after the state agents violated his right to counsel by unlawfully seizing attorney-client communications.
 {¶ 27} Both the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution guarantee a criminal defendant the right to counsel. This right does not attach until after the initiation of formal charges.[7] And an accused does not receive effective assistance of counsel if he is denied private consultation with his counsel.[8]
 {¶ 28} When examining government intrusion into the attorney-client privilege, we must strike a balance between the Sixth-Amendment interests of a criminal defendant and the state's interests in ensuring that a prosecution is not jeopardized by the unauthorized acts of overzealous officers, by applying the Weatherford test.[9] The test is applied on a case-by-case basis, analyzing the following four factors: (1) whether the government deliberately intruded in order to obtain confidential and privileged information; (2) whether the government obtained directly or indirectly any evidence that was or could have been used at trial as a result of the intrusion; (3) whether any information obtained was or could have been used in any manner detrimental to the defendant; and (4) whether details about trial preparation were learned by the government.
 {¶ 29} As we have already noted, this is an unusual case. Never before have we heard of a situation where state agents purposefully seized attorney-client communications twice in the same case. "Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful."[10] Surely if state agents were allowed to seize attorney-client communications at any time under the guise of another investigation, this right would be meaningless.
 {¶ 30} The Ohio Department of Public Safety twice searched George's home and seized what George claims were privileged attorney-client communications. That some documents were returned after the first seizure suggests that the state seized some materials it should not have. In a hearing, George's attorney testified (while being cross-examined by her co-counsel — yet another anomaly in this case) that she had sent a packet of documents to George just before the December 2002 search that was no longer at George's house after the search. George and his wife also testified that numerous legal documents relating to this case were seized. But we have no way of determining what, exactly, was seized in the December 2002 search.
 {¶ 31} The documents are apparently somewhere in the geographical jurisdiction of the United States District Court for the Northern District of Ohio. It seems that the federal prosecutor tried to return the documents to George's trial counsel, but they refused because they did not want to become part of the chain of custody.
 {¶ 32} Because nobody has had access to the documents in the federal prosecutor's possession, we cannot say whether there was any privileged attorney-client information seized in December 2002. And we cannot say whether the prosecutor in this case had access to any of the supposedly confidential information. We therefore cannot determine whether the motion to dismiss should have been granted or denied. The issue is not ripe for a decision and the lack of these documents for purposes of this motion is yet another reason this case should have been continued. But the motion should be considered when this case is remanded to the trial court. Perhaps by then, the documents will have been found.
 {¶ 33} We therefore overrule George's first assignment of error as premature.
 IV. The Indictment {¶ 34} In his second assignment, George argues that the indictment failed to adequately inform him of the charges and that the trial court erred by not dismissing it. While the indictment was not the state's finest work, most of it was constitutionally satisfactory. But count three, the charge of operating a gambling house, should have been dismissed.
 {¶ 35} George now argues that the state purposely drafted a vague indictment. The reason? So it could confuse him and his trial counsel and introduce new evidence later in the trial. We understand George's frustration. It is also clear that George's trial counsel did not need any help getting confused.
 {¶ 36} None of the 11 counts in the indictment were particularly well written, nor did the bill of particulars add much clarity. The indictment and the bill of particulars skirted along the fringes of constitutionally acceptable procedure. But most of the counts satisfied the constitutional requirements — albeit barely. We are forced to hope that this vagueness was a result of prosecutorial laziness rather than prosecutorial misconduct.
 {¶ 37} The state did fail to meet its constitutional requirements for count three, operating a gambling house. R.C.2915.03(A)(1) states, "No person, being the owner or lessee, or having custody, control, or supervision of premises, shall: * * * Use or occupy such premises for gambling * * *."
 {¶ 38} The third count of the indictment charged George with "being the owner or lessee or having custody, control, or supervision of premises, to wit: VARIOUS LOCATIONS IN HAMILTON AND CLERMONT COUNTY [sic], OHIO, used or occupied such premises for gambling * * *." The bill of particulars added this: "Defendants Jackson and George, along with other individuals and entities, set up several free standing instant bingo locations in Hamilton County and Clermont Counties [sic], Ohio, for purposes of engaging in charitable gambling. Jackson and George had custody, control, or supervision over the premises and directed how the operations should be run." The bill of particulars also listed several specific activities that George allegedly performed on the premises, including cheating, paying "volunteer" workers, and commingling funds.
 {¶ 39} But nowhere in the indictment or the bill of particulars did the state bother to identify any of the actual premises (instant bingo locations) over which George allegedly had custody, control, or supervision.
 {¶ 40} We have previously held that an indictment need not contain a recitation of the evidence supporting the charges.[11] The specific location, time, or circumstances of a conspiracy are not generally essential in an indictment.[12] A bill of particulars also need not give the accused specific evidence or serve as a substitute for a discovery demand[13]
 {¶ 41} But an indictment meets constitutional requirements only if it (1) contains the elements of the offense charged and fairly informs the defendant of the charges against him, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense.[14] And the indictment must contain "language sufficient to alert the person named therein that certain generally specified conduct constitutes a violation of an existing statute."[15]
 {¶ 42} Further, a trial court must consider two questions when a defendant requests specific times, dates, or places in a bill of particulars: (1) whether the state possesses such information; and (2) whether the information is material to the defendant's ability to prepare and present a defense.[16]
If the answer to both of these questions is yes, then the state must provide such information in the bill of particulars.
 {¶ 43} In State v. Headley,[17] the defendant was charged with trafficking in drugs, but the indictment failed to identify the controlled substance involved. The Ohio Supreme Court held that because the severity of the offense was dependent on the type of drug involved,[18] the identification of that drug was an essential element of the crime that had to be included in the indictment. We hold here that identifying which premises the defendant had in his custody, control, or supervision was essential in an indictment for operating a gambling house.
 {¶ 44} We cannot see any way that count three informed George of the charges against him. George was charged with operating a gambling house, but the indictment and the bill of particulars never listed any specific locations. A "house" must of necessity be located somewhere. George could not possibly prepare a defense without knowing which "various locations in Hamilton and Clermont" counties would be involved in the case. The information was material to George's ability to prepare and present a defense on this count.
 {¶ 45} And we have no way of knowing what evidence the state presented to the grand jury. Further, George has no way of showing that the gambling houses he supposedly operated in this case are not the same gambling houses that might be involved in future prosecutions.
 {¶ 46} Count three did not satisfy the constitutional requirements. We must therefore dismiss it.
 {¶ 47} We therefore sustain George's second assignment of error as it relates to count three, but overrule it concerning all of the other charges.
 V. The Continuances Should Have Been Granted {¶ 48} In his third assignment, George provides a laundry list of complaints relating to the fairness of his trial and due process: (1) the trial court abused its discretion by denying his requests for a continuance to give him time to recover the trial-preparation materials that the government had seized; (2) George's unlawful pretrial incarceration damaged his trial counsel's ability to defend the case; (3) the trial court should not have admitted George's recorded statements; (4) the admission of certain recordings and letters denied George his right to confront the witnesses against him; (5) transcripts of certain recordings were not the best evidence and should not have gone to the jury; (6) police reports of certain out-of-court statements should not have been admitted; and (7) the trial court was biased against George and harassed his trial counsel. Because we agree with his first argument, George's other six arguments are moot.
 {¶ 49} The decision to deny a continuance is within the broad discretion of the trial court; we will not reverse it absent an abuse of that discretion.[19] An "abuse of discretion" is a decision that is unreasonable, arbitrary, or unconscionable.[20] The answer to whether an abuse of discretion has occurred in the denial of a continuance must be found in the circumstances of each individual case, particularly the reasons presented to the trial court at the time of the request.[21]
 {¶ 50} When evaluating a motion for a continuance, a trial court should consider the following factors: (1) the length of the requested delay; (2) whether other continuances have been granted; (3) the inconvenience to the litigants, witnesses, opposing counsel, and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether the defendant contributed to the circumstance that gives rise to the request for a continuance; and (6) other relevant factors, depending on the unique facts of each case.[22] Thus, we must balance these factors to determine whether the trial court abused its discretion in this case.
 {¶ 51} While George did not ask for a specific time, he did ask for enough time to retrieve the documents. The trial court did not mention any previous continuances in its decision. Perhaps a continuance would have inconvenienced the prosecutor, the witnesses, and the court, but the inconvenience to George certainly outweighed any scheduling concerns of the other parties.
 {¶ 52} We cannot stress enough that the facts of this case were unique. State agents twice seized George's personal communications with his attorneys. While we cannot say what, exactly, the government agents seized from George's house, we can say that George presented sufficient testimony to warrant a continuance to allow him to retrieve the documents or at least to re-create them.
 {¶ 53} The trial court's reasons for denying the continuances included George's contribution to the circumstances necessitating the delay. The trial court stated — and the state now argues — that George contributed to the circumstances because he ostensibly engaged in illegal activity while out on bond, causing the seizure of the documents, and declined an offer to return the material.
 {¶ 54} Even if George had committed illegal acts while out on bond, that did not give the state the right to violate his constitutional rights by seizing privileged communications with counsel. And trial counsel should not have been forced to become part of the chain of custody of potential evidence just to move the current case along.
 {¶ 55} A defendant does not waive his right to counsel merely by committing another crime — rather, the right exists precisely so that situations like this do not occur. And we certainly do not know about any other crimes from this record. Unfortunately, we cannot say what documents the state seized in December 2002. But we can say that there was sufficient testimony suggesting that the state had seized — and not returned — attorney-client materials a few weeks before trial was set to begin. The trial court's denials of George's requested continuances were arbitrary and unreasonable.
 {¶ 56} The trial court therefore abused its discretion when it refused to grant George's motions for a continuance. This error was not harmless because George's allegations, if true, severely inhibited his ability to prepare a defense, and possibly gave the state access to privileged materials. We note that the partial dissent states that the defense lawyers should have accepted the return of the box of records. But that would open counsel up to charges that they phonied up the contents. The documents were evidence relevant to both the motion to dismiss and the continuance issue. They should have been kept in the court's custody. Or copies should have been made and sent to George's counsel. And this kind of mess should not happen again.
 {¶ 57} We must note that nowhere in the record is it suggested that the prosecutor in this case had anything to do with the February or December 2002 searches — they were conducted in a different county by a different prosecuting authority. But because of the nature of the rights at stake, we must reverse the trial court's decision and remand this case for a new trial.
 {¶ 58} We therefore sustain George's third assignment as it relates to the trial court's overruling of his requests for continuances.
 VI. Other Arguments {¶ 59} Though the sentence is necessarily vacated by our decision today, we note that a 25-year sentence here is questionable at best. We doubt that it could be supported under Ohio's sentencing guidelines. And the odd allegations of "terrorist" activity vitiated the sentencing process. Obviously, faced with allegations that he was sending money to Middle-Eastern terrorist organizations, George should have been afforded the opportunity to respond. It would be odd indeed if George, a third-generation American Catholic, would be involved with such groups. The failure to grant a continuance for that purpose was obviously reversible error.
 {¶ 60} The pretrial incarceration was also questionable. But we have granted an appeal bond in this case, and we expect that George will remain free for his new trial, so that issue is now moot.
 {¶ 61} The other evidentiary issues are moot, and we have little expectation that they will again arise, so we need not resolve them now.
 VII. An Unbiased Trial Court {¶ 62} While the point is now moot, we feel compelled to comment briefly on George's claim that the trial court was biased and that it harassed George's counsel.
 {¶ 63} From the pretrial hearing throughout the trial, the trial court often chastised George's trial counsel for questionable tactics or procedure. While we might disagree with the manner and tone in which this was done, we also believe that George's trial counsel made some of the trial court's comments necessary because they had interrupted the trial or had taken an extremely unusual approach to the case. A typical exchange is reflected in the following:
Prosecutor: Okay. Is there any question who was running this operation from start to finish, from the start of your involvement to the end of your involvement?
Witness: You mean Child Care?
Gutzwiller: I'll object to this. It is all encompassing. Covers all sorts of legal conclusions, and this guy is just fantasizing.
 {¶ 64} The court struck Gutzwiller's comment, then added, "Just make your objection, no editorial comments. Overruled."
 {¶ 65} But counsel repeatedly stood to make objections and argue the case, despite the judge's repeated warnings to stay seated and just make the objection without arguing. They often didn't even say "objection," but instead launched into an argument in the middle of the prosecution's examination.
 {¶ 66} We understand the trial court's lack of patience with trial counsel. They made the case unnecessarily difficult.
 {¶ 67} The control of the proceedings during a criminal trial rests with the trial court.[23] And a trial court must remain impartial and refrain from comments and behavior that might influence the jury.[24]
 {¶ 68} Here, most of the trial court's condescending comments occurred at sidebar or outside the presence of the jury. And those comments that were in front of the jury were caused by George's trial counsel's refusal to obey the trial court's prior warnings. But we note that the trial court could have conducted itself with a stronger sense of decorum and exercised greater restraint when dealing with George's trial counsel.
 {¶ 69} The trial court told George's mother, who is legally blind, that it would hold her in contempt for her comments from the audience. This was highly unusual and unnecessarily confrontational, but George's mother admitted to talking during the proceedings. And we cannot say that the remarks demonstrated any prejudice on the part of the trial court.
 {¶ 70} The trial court instructed the jury not to make any inferences from the rulings, statements, or facial expressions of the trial court. This case had obviously tried the trial court's patience, but at no time was there any evidence that the trial court was doing anything but its duty to uphold the law and to conduct the proceedings in an unbiased manner.
 {¶ 71} Accordingly, we dismiss the third count of the indictment, reverse the trial court's judgment, and remand for a new trial.
Judgment accordingly.
Winkler, P.J., concurs.
Hildebrandt, J., concurs in part and dissents in part.
[1] Freedom Road Found. v. Ohio Dept. of Liquor Control,80 Ohio St.3d 202, 1997-Ohio-346, 685 N.E.2d 522.
[2] See R.C. 2915.02(A)(2).
[3] See R.C. 2915.03(A)(1).
[4] See R.C. 1315.55(A)(1) through (3).
[5] See R.C. 2923.01(A).
[6] See R.C. 2923.32.
[7] See State v. Williams, 99 Ohio St.3d 439, 2003-Ohio-4164,793 N.E.2d 446.
[8] Coplon v. U.S. (C.A.D.C. 1951), 191 F.2d 749.
[9] State v. Milligan (1988), 40 Ohio St.3d 341,533 N.E.2d 724, citing Weatherford v. Bursey (1977), 429 U.S. 545,97 S.Ct. 837.
[10] U.S. v. Levy (C.A. 3, 1978), 577 F.2d 200, 209.
[11] State v. Gingell (1982), 7 Ohio App.3d 364,455 N.E.2d 1066.
[12] Id., citing Glasser v. U.S. (1942), 315 U.S. 60,62 S.Ct. 457.
[13] State v. Gingell (1982), 7 Ohio App.3d 364,455 N.E.2d 1066.
[14] State v. Childs, 88 Ohio St.3d 558, 2000-Ohio-425,728 N.E.2d 379.
[15] State v. Gingell (1982), 7 Ohio App.3d 364, 366,455 N.E.2d 1066.
[16] State v. Lawrinson (1990), 49 Ohio St.3d 238,551 N.E.2d 1261.
[17] (1983), 6 Ohio St.3d 475, 453 N.E.2d 716.
[18] See id.; R.C. 2925.03.
[19] State v. Unger (1981), 67 Ohio St.2d 65,423 N.E.2d 1078.
[20] State v. Adams (1980), 62 Ohio St.2d 151,404 N.E.2d 144.
[21] State v. Unger (1981), 67 Ohio St.2d 65,423 N.E.2d 1078, citing Ungar v. Sarafite (1964), 376 U.S. 575,84 S.Ct. 841.
[22] State v. Unger (1981), 67 Ohio St.2d 65,423 N.E.2d 1078.
[23] See R.C. 2945.03.
[24] State ex rel. Wise v. Chand (1970), 21 Ohio St.2d 113,256 N.E.2d 613.