OPINION. *Page 2 
{¶ 1} In five assignments of error, defendant-appellant Terry Mizell claims that he was improperly convicted of child endangerment and felonious assault.[1] We reject these claims and affirm the judgment of the trial court.
 Baby Receives Severe Injuries {¶ 2} On July 20, 2006, DaJawana Martin left for work at 5:45 AM and left her children in the care of Mizell. She had known Mizell for four months, and he had been living with her for two months. At the time she left for work, her two-month-old son, Skylan, was healthy.
 {¶ 3} At some point in the morning, Skylan suffered a significant brain injury. Mizell claimed, in a subsequent statement to police, that the child had fallen from a bed (which was approximately 24 inches — at most — high) and had landed on the hard floor. Mizell said that he had performed CPR on the child because the child was unresponsive.
 {¶ 4} Mizell sent a text message to Martin later in the day, telling her that Skylan had fallen from the bed. The two sent messages back and forth for the next hour. Mizell did not give details about the incident to Martin, including the fact that he had performed CPR on the infant. The two eventually decided that Mizell should take Skylan to the emergency room. At no point did Mizell call 911.
 {¶ 5} Martin had to take the bus from her worksite to meet Mizell at the hospital. The bus ride took over an hour, and when she arrived, Mizell and Skylan were not there. According to Martin, Skylan appeared lifeless when he arrived at the hospital. *Page 3 
While it is not entirely clear from the record, several hours seem to have passed between the time of the injury and Skylan's arrival at the emergency room.
 {¶ 6} Emergency-room personnel immediately began to administer CPR and other life-saving measures. The infant was then taken into emergency surgery to relieve pressure from his brain. Because of the significant delay, Skylan's injuries had become more serious. While Skylan survived, he is developmentally delayed and has cerebral palsy and a reduced brain size. His brain will remain undersized for the rest of his life. He continues to receive treatment.
 The Road to Conviction {¶ 7} Mizell was charged with child endangerment, in violation of R.C. 2919.22(A), under case number B-0606897. Mizell entered a plea of guilty on February 8, 2007. After the trial court reviewed presentence information and determined that it would not sentence Mizell to community control, Mizell was allowed to withdraw the plea on April 9, and the case was set for trial on June 4.
 {¶ 8} On May 9, the Hamilton County Grand Jury returned a one-count indictment against Mizell for felonious assault, in violation of R.C. 2903.11(A)(1), under case number B-0704314. The indictment alleged that Mizell had knowingly caused serious physical harm to Skylan.
 {¶ 9} On June 4, Mizell failed to appear for his trial and a capias was issued. He was arrested ten days later.
 {¶ 10} The two cases were joined and were set for trial on August 13. On that date, counsel asked for a continuance and a competency evaluation because Mizell was not assisting in his defense. A hearing was held on September 18, Mizell was deemed competent, and the case was set for trial on October 9. *Page 4 
 {¶ 11} On the date set for trial, Mizell informed the trial court that he was not satisfied with his attorney and wanted new counsel. The attorney he had was the second attorney that had been appointed for him, the first having withdrawn in November 2006. The trial court denied his request. Mizell continued to argue with the trial court, becoming increasingly uncooperative and repeatedly ignoring the trial court's instructions to calm down. He then briefly struggled with one deputy until others were called to restrain him.
 {¶ 12} Because of his conduct, deputies requested that they be allowed to place Mizell in a stun belt. A hearing was held immediately after Mizell was placed in the belt, during which the trial court gave its reasons for ordering the use of the belt.
 {¶ 13} At this point, Mizell asked to represent himself and sought a continuance so that he could review the medical records. The trial court allowed Mizell to represent himself, with his appointed attorney as standby counsel, and told Mizell that he could have a few hours to review the records. But the request for a continuance was denied.
 {¶ 14} Acting as his own counsel, Mizell repeatedly informed the prospective jurors that he was representing himself because the trial court would not give him a new lawyer. The trial court informed him that these comments were improper. In response, and in an attempt to show the jurors the conditions under which he was operating, he told them that "the Court has gotten irate and threatening [sic] with me with various things." He showed them the stun belt and told them, "I have an electronic shock around my waist that if I say anything or do anything that the Court disagrees with, that officer there will push a button and 50,000 volts of electricity will come through me." The trial court instructed the jury not to speculate on the reasons that the belt was being used, nor was it to consider its use as evidence against him. *Page 5 
 {¶ 15} After the state gave its opening statement, Mizell was asked to give his. Instead, he repeatedly asked the trial court for a continuance so that he could prepare his case. The trial court denied the request. Mizell's opening statement consisted mainly of the argument that everyone involved in the case knew that his crimes were not serious because he had been offered probation as part of the plea process. The trial court sustained the state's objections to this, and it was ordered stricken from the record.
 {¶ 16} The state called Martin to testify. But Mizell kept talking and interrupting, which prevented the prosecutor from hearing Martin's responses to his questions. Mizell was warned to be quiet. When questioning resumed, Mizell continued to disrupt the proceedings. When the trial court again admonished Mizell, he continued to respond that he needed "to get the evidence I requested." When he was told that he would be removed if he did not stop, he continued. After Mizell was removed, the prosecutor told the trial court that Mizell had told corrections officers in the jail that "he was going to get his continuance today no matter what he had to do." Standby counsel was returned to his role as primary counsel, and the case proceeded.
 {¶ 17} Mizell was allowed to return to the trial on the second day of the proceedings. After the state rested, Mizell tried to call two witnesses who were going to testify that Mizell had been offered probation, but the trial court refused to allow the testimony.
 {¶ 18} The trial concluded, and the jury found Mizell guilty of both counts. For the child-endangerment count, the trial court imposed the maximum sentence of five years "because you didn't take the child to the hospital. Maybe if you had taken the child to the hospital sooner, he wouldn't have been as bad." For the felonious-assault count, the trial court imposed the maximum sentence of eight years "because it's clear that you *Page 6 
shook this baby, injured it initially." The trial court ordered Mizell to serve the sentences consecutively.
 Use of Stun Belt {¶ 19} In his first assignment of error, Mizell argues that the trial court abused its discretion by ordering him to wear a stun belt during the trial. We disagree.
 {¶ 20} As this court has noted, "[a] stun belt may be used only under `unusual circumstances' and only as a `last resort.' A court may order a stun belt only when the record shows that restraints are justified `by an essential state interest specific to each trial,' and when, upon consideration of `the [defendant's] actions both inside and outside the courtroom, as well as his demeanor while court is in session,' the court finds that the stun belt is necessary to advance that state interest."[2]
 {¶ 21} In this case, Mizell's conduct prior to the trial court's decision to order the use of the stun belt amply justified the decision to do so. He had demonstrated that he would not listen to the instructions of the court, and that he was not above becoming physical to show his displeasure with the proceedings. The evidence supported the conclusion that the use of the stun belt was necessary to advance an essential state interest — an orderly proceeding.
 {¶ 22} Even if the record did not so support the conclusion, we would find no reversible error. The Ohio Supreme Court has held that a defendant waives any error relating to the use of a stun belt by failing to object.[3] Since Mizell failed to object at trial, he would have to show prejudicial plain error to prevail on appeal.[4] *Page 7 
 {¶ 23} The record does not indicate that Mizell was made uncomfortable by the belt or that it impeded his ability to represent himself or to assist counsel. Therefore, the only way that Mizell could show prejudice would be if the jury was made aware of it.[5] While the jury did know that he was wearing the belt, the jurors only knew this because Mizell himself showed it to them during voir dire. Thus, any error in this regard would have been invited.
 {¶ 24} Mizell's first assignment of error is overruled.
 The Motions for a Continuance and New Counsel {¶ 25} In his second assignment of error, Mizell contends that the trial court abused its discretion when it denied his motion for the appointment of a new attorney. He also challenges the denial of the continuance he sought to review the records and to prepare his defense.
 {¶ 26} The right to counsel does not include a right to a peaceful and meaningful relationship between counsel and the defendant.[6] "[T]o discharge a court-appointed attorney, the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel. The term of art `actual conflict' refers not to a personality conflict but to a conflict of interest. The Sixth Amendment does not guarantee `rapport' or a `meaningful relationship' between client and counsel."[7] Thus, "[h]ostility, tension, or personal conflict between an attorney and a client that do not interfere with the preparation or presentation of a competent defense are insufficient to justify the *Page 8 
withdrawal of appointed counsel."[8] Under the relevant analysis, the right to counsel must be balanced against the court's authority to control its docket, as well as its awareness that a "demand for counsel may be utilized as a way to delay the proceedings or trifle with the court. "[9]
 {¶ 27} In evaluating a motion for a continuance, the trial court should consider (1) the length of the requested delay; (2) whether other continuances have been granted; (3) the inconvenience to the litigants, witnesses, opposing counsel, and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether the defendant has contributed to the circumstance that gives rise to the request for a continuance; and (6) other relevant factors of each case.[10]
 {¶ 28} This case had been pending in the trial court for many months, and it was not until the day of trial that Mizell claimed that he needed a new attorney. Throughout the proceedings, Mizell's conduct was disrespectful and disruptive. The trial date had been continued several times, once because Mizell failed to appear and once because his refusal to cooperate with counsel rose to the level of bringing his competence into question. His behavior made it clear that he would have done whatever it took to derail the proceedings. The trial court did not abuse its discretion when it reached this conclusion. Therefore, the decision not to continue the case or to appoint *Page 9 
new counsel was not an abuse of discretion. Mizell's second assignment of error is overruled.
 Right to Self-Representation {¶ 29} In his third assignment of error, Mizell argues that the trial court improperly infringed on his constitutional right to represent himself by removing him from the courtroom due to his disruptive behavior and by allowing standby counsel to represent him during his absence. We disagree.
 {¶ 30} The right to self-representation is not absolute.[11] At times, the government's interest in ensuring the integrity and efficacy of the trial will outweigh the defendant's interest in acting as his own lawyer.[12] Further, standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not "seriously undermine" the "appearance before the jury" that the defendant is representing himself.[13]
 {¶ 31} We hold that when a defendant elects to represent himself at trial in a criminal proceeding, and that defendant's conduct, following a warning to desist, is so disruptive that it threatens the integrity and efficacy of the trial, he has forfeited his right to self-representation.[14] The trial court may remove the defendant from the proceedings and allow standby counsel to represent the defendant.[15] In its discretion, the court may *Page 10 
allow the defendant to return and resume his self-representation when it is satisfied that the defendant no longer poses a risk of future disruption.
 {¶ 32} In this case, Mizell's continued disruptive behavior threatened to undermine the integrity and efficacy of the trial. His outbursts during the state's direct examination of Martin were distracting to the jury and prevented the prosecutor from hearing her responses to his questions. Mizell was warned repeatedly that continuing on that course would result in his removal from the proceedings. His continued disruptive behavior resulted in the forfeiture of his right to self-representation. The trial court did not abuse its discretion when it ordered Mizell to be removed. Nor did it abuse its discretion when it ordered standby counsel to resume his role of representing Mizell until the court became satisfied that Mizell could return and resume self-representation.
 {¶ 33} Within this assignment of error, Mizell claims that appointed counsel was ineffective during the time he stood in Mizell's place. He argues, without citation to the record, that "he allowed the prosecutor to completely lead all of the State's witnesses," that "[h]e allowed the State's witnesses to offer hearsay statements and offer opinions of third parties without objection," and that "[h]e allowed Ms. Martin to parade the child in front of the jury."
 {¶ 34} The failure to object to leading questions does not constitute ineffective assistance.[16] As for the complaints regarding hearsay and third-party opinions, Mizell has not cited the specific instances of allegedly ineffective assistance in the record, nor has he demonstrated how he was prejudiced by any such transgressions.[17] Finally, *Page 11 
Mizell fails to argue how allowing the jury to see the victim in this case was ineffective assistance.[18]
 {¶ 35} Mizell's third assignment of error is overruled.
 Pre-Indictment Delay and Speedy Trial {¶ 36} In his fourth assignment of error, Mizell claims that the trial court committed plain error when it failed to dismiss the felonious-assault charge due to pre-indictment delay and a violation of his right to a speedy trial. We disagree.
 {¶ 37} We addressed nearly the identical argument in State v.Maddox, [19] and the holding in that case is controlling here. InMaddox, the defendant faced two separate indictments, filed two years apart, arising from the same course of conduct. This court noted the recent Ohio Supreme Court decision in State v. Blackburn[20] and concluded that "there were numerous delays occasioned by Maddox before the issuance of the 2006 indictment, and there was no assertion that the speedy-trial time had expired with respect to the 2004 charges. UnderBlackburn, the delays attributable to Maddox under the 2004 indictment applied also to the 2006 charges, and the later charges were therefore brought to trial within the deadline imposed by the speedy-trial statute." *Page 12 
 {¶ 38} In this case, there was no claim that the speedy-trial time had expired with respect to the child-endangerment charge in the case numbered B-0606897; therefore any delays in that case did not work in Maddox's favor in the prosecution of the separately numbered felonious-assault charge. The felonious-assault charge was brought to trial within the deadline imposed by the speedy-trial statute.
 {¶ 39} The Maddox decision also addressed the issue of pre-indictment delay. In that case, this court rejected the argument regarding pre-indictment delay because the defendant had failed to show prejudice.[21] This court held that even though the state may have had all the information necessary to include the additional charges in the original indictment, the defendant had to show that prejudice had resulted from the delay.[22]
 {¶ 40} In this case, Mizell argues that he was prejudiced because "the Felonious Assault charge was much more significant [than] the Endangering charge, plus Appellant was subject to consecutive sentences for each charge, which again, significantly increased his potential prison sentence." But this argument only relates to how Mizell may have been prejudiced in a general sense by being charged with felonious assault, and it has no bearing on any prejudice he may have suffered as a result of the pre-indictment delay. When a defendant points to no particularized loss of evidence or witnesses as a result of pre-indictment delay, and when nothing in the record demonstrates such a loss, no actual prejudice is shown.[23] *Page 13 
 {¶ 41} Mizell also argues that counsel was ineffective for failing to raise these issues below. But since the arguments would have been without merit had they been raised, counsel was not ineffective for failing to raise them. Mizell's fourth assignment of error is overruled.
 Sufficiency and Manifest Weight of the Evidence {¶ 42} In his last assignment of error, Mizell claims that his convictions were based upon insufficient evidence and were against the manifest weight of the evidence. We disagree.
 {¶ 43} In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[24] In a challenge to the weight of the evidence, we must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[25]
 {¶ 44} To convict Mizell of child endangerment, the state had to prove that, while acting in loco parentis, he had created a substantial risk to the health or safety of Skylan by violating a duty of care, protection, or support.[26] To convict Mizell of felonious assault, the state had to prove that he had knowingly caused serious physical harm to Skylan.[27]
 {¶ 45} The evidence demonstrated that Mizell had been charged with the care of Skylan on July 20, 2006. While Mizell was watching the child, he suffered a *Page 14 
significant injury that Skylan's treating doctor testified could not have been the result of a fall from a bed, as Mizell had claimed in his statement to police. The doctor testified that the "only mechanism" for such injuries was "a violent shaking type of episode that happens to these babies." The doctor also testified that the significant delay between the onset of the injury and the initial treatment made the condition worse since "the quicker that we can catch this type of bleeding and monitor these children and provide, if needed, surgical intervention, the better the prognosis."
 {¶ 46} Mizell claims that he did not violate a duty of care owed to Skylan because Skylan accidentally fell from a bed, he performed CPR and monitored the child, the child was responsive and he believed the child would be fine, and he took the child to the hospital. But his account of how the injury occurred was directly contradicted by the medical evidence presented. His claim that the child improved after CPR was contradicted by the testimony that "Skylan would have manifested some type of symptoms soon after his injury and over time would have deteriorated in his condition." Finally, he admitted that he did not call 911 because "like I said, I'm thinking this little boy can't die in my custody. This little boy can't die on my watch." This admission, coupled with a previous comment that he had wanted to wait until Martin returned home, could easily have led the jury to conclude that Mizell had purposefully delayed seeking treatment in an attempt to avoid responsibility for his actions, to the great detriment of the infant Skylan.
 {¶ 47} Based upon the record before us, a rational trier of fact could have found all the essential elements of child endangerment and felonious assault beyond a reasonable doubt. Additionally, we have reviewed the entire record, weighed the evidence, and considered the credibility of the witnesses. In our view, the trier of fact *Page 15 
did not lose its way and create a manifest miscarriage of justice. Mizell's fifth assignment of error is overruled.
 Conclusion {¶ 48} For the foregoing reasons, we overrule Mizell's five assignments of error. The judgment of the trial court is affirmed.
Judgment affirmed.
SUNDERMANN, P.J., and HENDON, J., concur.
[1] R.C. 2919.22(A) and 2903.11(A)(1).
[2] State v. Leonard, 1st Dist. No. C-061025, 2007-Ohio-7095, at ¶ 6 (citations omitted).
[3] State v. Johnson, 112 Ohio St.3d 210, 2006-Ohio-6404,858 N.E.2d 1144, at ¶ 247.
[4] Id.
[5] See Johnson, 112 Ohio St.3d 210, at ¶ 248.
[6] State v. Henness, 79 Ohio St.3d 53, 65, 1997-Ohio-405,679 N.E.2d 686.
[7] Id.
[8] State v. Crew, 8th Dist. No. 86943, 2006-Ohio-4102, at ¶ 17, quoting State v. Dykes, 8th Dist. No. 86148, 2005-Ohio-6636.
[9] Id., citing United States v. Krzyske (C.A.6, 1988), 836 F.2d 1013,1017; see, also, State v. Murphy, 91 Ohio St.3d 516, 523, 2001-Ohio-112,747 N.E.2d 765.
[10] State v. Hillis, 162 Ohio App.3d 280, 2005-Ohio-3591,833 N.E.2d 344, at ¶ 10, citing State v. George, 1st Dist. No. C-030216,2004-Ohio-2868, at ¶ 49, and State v. Unger (1981), 67 Ohio St.2d 65,423 N.E.2d 1078.
[11] Martinez v. Court of Appeal of California (2000), 528 U.S. 152,161, 120 S.Ct. 684.
[12] Id.
[13] Martinez, 528 U.S. at 162, citing McKaskle v. Wiggins (1984),465 U.S. 168, 187, 104 S.Ct. 944.
[14] See United States v. Young (S.D.Ohio 2001), 199 F.Supp.2d 697
(the trial court may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct), citingUnited States v. Brock (C.A.7, 1998), 159 F.3d 1077.
[15] See Young, 199 F.Supp.2d at 702 ("Based upon the foregoing, the Court revokes the Defendant's right of self-representation. As a consequence, the Court removes Charles A. Smiley, Jr., as Defendant's legal advisor, and reappoints him as counsel of record for the Defendant.").
[16] State v. Jefferson, 2nd Dist. No. 2002 CA 26, 2002-Ohio-6377, at ¶ 9, citing State v. Jackson, 92 Ohio St.3d 436, 449, 2001-Ohio-1266,751 N.E.2d 946.
[17] See Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052; see, also, State v. Wharton, 9th Dist. No. 23300, 2007-Ohio-1817, at ¶ 43 (when a defendant does not provide specific citations to the record, law, or argument related to ineffective assistance, it is not the court's duty to scour the record for evidence to support the claim), discretionary appeal not allowed, 115 Ohio St.3d 1412, 2007-Ohio-4884,873 N.E.2d 1316.
[18] See State v. Kemp (Oct. 31, 1997), 1st Dist. No. C-960478 (a trial court acts within its discretion in permitting the jury to see a victim's scars because no unfair prejudice, as required by Evid. R. 403, results therefrom).
[19] 1st Dist. Nos. C-070482 and C-070483, 2008-Ohio-3447.
[20] Maddox, 2008-Ohio-3477, at ¶ 15, citing State v. Blackburn,118 Ohio St.3d 163, 2008-Ohio-1823, 887 N.E.2d 319, syllabus ("In calculating the time within which a criminal defendant must be brought to trial under R.C. 2945.71, periods of delay resulting from motions filed by the defendant in a previous case also apply in a subsequent case in which there are different charges based on the same underlying facts and circumstances as the previous case.").
[21] Id. at ¶ 17-18.
[22] Id. at ¶ 18.
[23] See State v. Neeley (2001), 143 Ohio App.3d 606, 633-634,758 N.E.2d 745, discretionary appeal not allowed (2001), 93 Ohio St.3d 1427,755 N.E.2d 35.
[24] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[25] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[26] R.C. 2919.22(A).
[27] R.C. 2903.11(A)(1). *Page 1